# **EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION

| | | |
|---|---|---|
| BANCREDITO HOLDING CORPORATION, on its own behalf and derivatively for the benefit of and on behalf of Nominal Defendant BANCREDITO INTERNATIONAL BANK & TRUST CORPORATION, | ) ) ) ) ) | **Case No. 23-cv-00575-M-BM** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| DRIVEN ADMINISTRATIVE SERVICES LLC, | ) ) | **DECLARATION IN SUPPORT OF DRIVEN ADMINISTRATIVE SERVICES, LLC'S MOTION TO DISMISS** |
| Defendant, | ) ) | |
| And | ) ) | |
| BANCREDITO INTERNATIONAL BANK & TRUST CORPORATION, | ) ) ) | |
| Nominal Defendant. | ) ) | |
| _____ | / | |

## <u>DECLARATION OF DRIVEN ADMINISTRATIVE SERVICES LLC IN SUPPORT OF MOTION TO DISMISS</u>

Pursuant to 28 U.S.C. § 1746, I, Ryan Marín, under penalty of perjury declare as follows:

1.  My name is Ryan Marín. I am over the age of eighteen (18) years old. I am a citizen of the United States of America and resident of Puerto Rico. I am the Managing Member of Driven Administrative Services LLC ("Driven"). In that capacity, I have personal knowledge of the facts stated herein.

2.  I provide this declaration in support of Driven's Motion to Dismiss the Complaint for Lack of Subject-Matter Jurisdiction, Personal Jurisdiction, and Improper Venue.

3.  I have read the Complaint filed in this action and reviewed the exhibits attached thereto.

### <u>General Background of Driven</u>

4.  Driven is a limited liability company created under the laws of Puerto Rico and has its principal place of business in Puerto Rico, located at B7 Tabonuco Street, Suite 302, Guaynabo, PR, 00968.

5. Driven is a business advisory firm and operates exclusively out of its sole office located in Guaynabo, Puerto Rico. Driven has maintained this office space since November 2021.

6. The sole member of Driven is Driven P.S.C., another limited liability company created under the laws of Puerto Rico.

7. Driven P.S.C. is comprised of five individual members, all of whom reside in Puerto Rico. These members are:

        a. Ryan Marín, resident of Guaynabo, Puerto Rico;
        b. Wallace Rodríguez Parissi, resident of Trujillo Alto, Puerto Rico;
        c. Sigfredo Vélez, resident of Guaynabo, Puerto Rico;
        d. Wigberto Marcano, resident of Humacao, Puerto Rico; and
        e. Patricia Wangen, resident of San Juan, Puerto Rico.

8. All of Driven's officers and directors are located in Puerto Rico.

9. Driven has 180 employees, and with the exception of one employee who works remotely from the State of North Carolina, all of Driven's employees are based in Puerto Rico.

10. All of Driven's bank accounts are held in Puerto Rico at Banco Popular de Puerto Rico.

### The Allegations Underlying this Suit All Occurred in Puerto Rico

11. In August 2022, Bancrédito International Bank & Trust Corporation ("Bank"), its sole shareholder Bancrédito Holding Corporation ("Plaintiff"), and the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF," for its Spanish acronym), entered into a voluntary Liquidation Plan for the Bank. This Liquidation Plan appointed Driven as administrator for the Bank during the liquidation process and charged Driven with assisting the Bank in the implementation of the Liquidation Plan. A true and correct copy of the Liquidation Plan is attached hereto as **Exhibit 1**.

12. On January 11, 2023, OCIF entered an Order for Provisional and Permanent Appointment of Receiver and License Revocation (*Querella y Orden de Nombramiento Provisional y Permanente de Síndico y Revocación de Licencia*) ("Receivership Order"). A true and correct copy of the Receivership Order is attached to the Complaint as Exhibit A. In the Receivership Order, OCIF appointed Driven as Receiver for the Bank, to handle the liquidation of the Bank with full authority to take all decisions related thereto.

13. In my capacity as Managing Member of Driven, I, along with Senior Manager now Director, Mario Sánchez ("Director Sánchez"), communicated with employees or agents of the Bank to obtain access to the Bank's books and records and other pertinent information to take charge of the process of liquidation, now as the Receiver appointed by OCIF.

14. Specifically, I communicated with the Bank's then board of directors and officers, including special committees, that were handling the Bank's private administration until Driven's appointment as Receiver.

15. My communications with the Bank were conducted by various means, including in-person meetings, telephone calls, mail, email, and zoom or Microsoft Teams calls. During these communications, I was almost always located in Puerto Rico, as was Director Sánchez, who participated in some of these communications with me. I may have participated on a call during a business trip outside of Puerto Rico, but at no point did I ever communicate with the Bank from North Carolina. In addition, the Bank employees with whom I was communicating, to the best of my knowledge, were located in Puerto Rico during these communications.

16. Many of the communications with the Bank and documents exchanged between Driven and the Bank were in Spanish. All documents exchanged between Driven and the Bank that are within Driven's custody and control are located in Puerto Rico and/or stored electronically on servers located in Puerto Rico. To the best of my knowledge, the Bank stored hard copies of documents in a storage facility in Puerto Rico and in the Bank's office in Puerto Rico.

17. In my capacity as Managing Member of Driven and pursuant to Driven's appointment as Receiver to the Bank, I also communicated with Plaintiff on occasion.

18. Specifically, I communicated with Plaintiff's President and CEO, Luis Zapata, and its legal counsel.

19. Communications between Driven and Plaintiff were conducted by various means, including in-person meetings, telephone calls, mail, email, and zoom or Microsoft Teams calls. During these communications, I was almost always located in Puerto Rico, as was Director Sánchez, who participated in some of these communications with me. I may have participated on a call during a business trip outside of Puerto Rico, but at no point did I ever communicate with Plaintiff from North Carolina.

20. The communications with the Plaintiff and documents exchanged between Driven and Plaintiff were in both English and Spanish. All documents exchanged between Driven and Plaintiff that are within Driven's custody and control are located in Puerto Rico and/or stored electronically on servers located in Puerto Rico.

21. In my capacity as Managing Member and pursuant to Driven's appointment as Receiver to the Bank, I also regularly communicated with OCIF's commissioner, Natalia Zequeira, and OCIF's legal counsel, Heriberto López.

22. My communications with OCIF were conducted by various means, including in-person meetings, telephone calls, mail, email, and zoom or Microsoft Teams calls. During these communications with OCIF, I was almost always located in Puerto Rico, either meeting at OCIF's office in Puerto Rico or communicating remotely from Puerto Rico. I may have participated on a call during a business trip outside of Puerto Rico, but at no point did I ever communicate with OCIF from North Carolina.

23. Communications between Driven and OCIF and documents exchanged between Driven and OCIF were in both English and Spanish. All documents exchanged between Driven and OCIF that are within Driven's custody and control are located in Puerto Rico and/or stored electronically on Driven's servers, which are also located in Puerto Rico.

24. Pursuant to Driven's appointment as Receiver to the Bank, Driven participated in communications with the Financial Crimes Enforcement Network of the U.S. Department of the Treasury ("FinCEN"), in both Puerto Rico and Washington, D.C., primarily through its lawyers, including: McConnell Valdés LLC, McDermott Will & Emery, and Holland & Knight LLP.

25. I signed the Consent Order on behalf of Driven in Puerto Rico, pursuant to the authority vested in me by the Commissioner of OCIF in the Receivership Order and the Settlement Agreement entered into between the Bank, OCIF and Plaintiff on March 10 and 13, 2023, a copy of which is attached as **Exhibit 2**.

### Driven's Lack of Connections with the State of North Carolina

26. Driven operates its business exclusively in Puerto Rico.

27. Driven does not market to or solicit clients in North Carolina and has no clients in the State of North Carolina.

28. Driven has never maintained any bank accounts in the State of North Carolina or anywhere else outside of Puerto Rico.

29. Driven has never owned or leased any office space in the State of North Carolina or anywhere else outside of Puerto Rico.

30. Driven does not own or lease any real property in the State of North Carolina or anywhere else outside of Puerto Rico.

31. With the exception of the mailing address of its registered agent, Driven has never maintained a mailing address in the State of North Carolina or anywhere else outside Puerto Rico.

32. Driven has never maintained a telephone number with a North Carolina area code.

33. Driven has only one remote employee, Lydia Márquez ("Remote Employee"), who resides in the State of North Carolina. The billing for her services is generated in Puerto Rico and payment for the same is received in Puerto Rico.

34. In 2022, Driven offered Remote Employee a full-time position even though Remote Employee wished to work remotely from North Carolina. However, Remote Employee has always performed work for Driven's clients, which are all based in Puerto Rico. Remote Employee does no work for anyone in North Carolina nor does she solicit business from anyone in North Carolina.

35. In June 2022, Driven submitted an Application for Certificate of Authority for Limited Liability Company with the State of North Carolina, Department of the Secretary of State. A true and correct copy of the 2022 Application for Certificate of Authority is attached hereto as **Exhibit 3**. In the Certificate of Authority, Driven identified itself as a limited liability company organized under the laws of Puerto Rico and identified its officers, all of whom had business addresses in Puerto Rico. *Id*.

36. Driven applied for a Certificate of Authority exclusively for the purpose of being able to pay Remote Employee's withholding taxes in compliance with state tax regulations.

37. Driven obtained the Certificate of Authority on July 15, 2022.

38. In October 2022, Driven officially hired Remote Employee as a full-time employee.

39. Driven's employment agreement with Remote Employee was negotiated in Puerto Rico and contains a choice-of-law provision that specifies that Puerto Rico law governs the agreement.

40. Driven pays Remote Employee out of its bank accounts located in Puerto Rico at Banco Popular de Puerto Rico.

41. Driven did not assist Remote Employee in obtaining a home or financing for a mortgage in the State of North Carolina.

42. Remote Employee had no involvement whatsoever in Driven's appointment as Receiver for the Bank.

43. Remote Employee had no involvement whatsoever in Driven's exercise or performance of its duties as Receiver for the Bank and has not done any work for the Bank.

44. Remote Employee has never communicated with any employee or representative of the Bank, Plaintiff, OCIF, or FinCEN.

45. Not a single one of Driven's communications with the Bank, Plaintiff, OCIF, or FinCEN took place in the State of North Carolina.

**<u>Hardship to be Suffered by Driven if Forced to Litigate in the State of North Carolina</u>**

46. Driven will be severely inconvenienced and will incur substantial hardship if forced to litigate this action in the State of North Carolina.

47. All of Driven's officers, directors, employees, electronic servers, and physical records are located in Puerto Rico.

48. All of Driven's employees who are involved in or have knowledge of the actions taken by Defendant as receiver of the Bank are located in Puerto Rico.

49. All of the former members of the Bank's board of directors are located in Puerto Rico, with the exception of Juan Carlos Eyherabide, who resides in Miami and has not had any involvement with the Bank's liquidation and receivership since at least March 2023.

50. Driven has no connection or control over the former members of the Bank's board of directors and thus will not be able to ensure their attendance at any proceeding in North Carolina or compliance with any order issued in North Carolina.

5

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of November, 2023.

Ryan Marin
Managing Member
Driven Administrative Services, LLC

6

# EXHIBIT 1

# PLAN OF LIQUIDATION AND DISSOLUTION OF
## BANCREDITO INTERNATIONAL BANK & TRUST CORPORATION

**WHEREAS,** Bancrédito International Bank & Trust Corporation (the "Corporation"), is a corporation organized under the laws of the Commonwealth of Puerto Rico; and

**WHEREAS,** the Corporation has a license under Act No. 52 of August 11, 1989, as amended, better known as the Puerto Rico International Banking Center Regulatory Act (the "Act 52"), as an international banking entity issued by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"); and

**WHEREAS,** the Board of Directors of the Corporation (the "Board") has approved and determined that this Plan of Liquidation and Dissolution of the Corporation (this "Plan") is advisable and in the best interests of the shareholder of the Corporation;

**WHEREAS,** the Board has directed that this Plan be submitted to its sole shareholder, Bancredito Holding Corporation (the "Shareholder"), owner of all the outstanding voting shares of the Corporation's common stock, for its approval in accordance with the requirements of the Puerto Rico General Corporation Law of 2009 (the "PRGCL"), the Internal Revenue Code for the New Puerto Rico, as amended (the "Code"), and the Corporation's Articles of Incorporation and By-Laws; and

**WHEREAS,** upon approval of this Plan by the Shareholder and OCFI, the Corporation shall voluntarily dissolve and completely liquidate in accordance with the PRGCL and the Code, upon the terms and conditions set forth below;

**NOW, THEREFORE,** the Board hereby adopts and sets forth this Plan of Liquidation and Dissolution of the Corporation as follows:

1.  Definitions. As used herein, the following words and terms shall have the following meanings:

   **"Administrator"** means Driven Administrative Services LLC, or any successor administrator appointed by the Board and approved by the Shareholder and the OCFI.

   **"Business Day"** means any day of the year other than a Saturday, Sunday or a day on which banks in the Commonwealth of Puerto Rico are authorized or required by law, regulation or executive order to close.

   **"Cash Reserve Account"** means a cash reserve established by the Administrator of the Corporation with sufficient funds in cash or readily available funds to pay ALL the Deposits.

   **"Creditor"** means a person with whom the Corporation has an outstanding contractual

payment obligation, including but not limited to depositors, lenders, lessors, service providers and employees.

"**Department of State**" means the Department of State of the Commonwealth of Puerto Rico.

"**Deposits**" means liabilities of the Corporation in the form of demand deposits or time deposits but does not include trust or custody accounts held with the Corporation.

"**Depositors**" means a person that holds a Deposit in the Corporation.

"**Effective Date**" shall have the meaning ascribed to such term in Section 2 of this Plan.

"**Expenses of the Corporation**" means the following expenses of the Corporation: (i) payroll, (ii) operational expenses, including but not limited to leases, utilities, licensing of software; (iii) fees of advisors including but not limited to accountants, attorneys, auditors, management and compliance consultants; and (iv) fines, penalties and administrative penalties due to governmental authorities, including but not limited to the OCFI and the Financial Crimes Enforcement Network of the U.S. Department of the Treasury (FinCEN).

"**Inactive Accounts**" means Deposit accounts that have been inactive for the last twelve (12) months.

"**MOU**" means the Memorandum of Understanding entered into by and between the Corporation and the OCFI dated December 21, 2021 attached hereto as **Exhibit A**.

"**Liquidation Distribution**" means a distribution of assets or liabilities of the Corporation to the Shareholder pursuant to the terms of this Plan.

"**Liquidation Period**" means the period from and including the Effective Date to and including the date on which all Liquidation Distributions are concluded.

"**Look Back Review**" shall have the meaning ascribed to such term in Section 7 of this Plan.

"**Non-Related Person**" means a person that is not a Related Person.



"**Obligations**" means any obligations or liabilities of the Corporation other than Deposits.

"**Related Person**" means the persons listed in **Exhibit B**.

2.      Effective Date of Plan. The Plan shall be and become effective on the date of approval of the Plan by the affirmative written consent of the Corporation's Shareholder and the OCFI (the "Effective Date"). The stock transfer books of the Corporation shall be closed on the Effective Date. This Plan shall not become effective until it has been approved by the affirmative consent or vote of the Shareholder and has been approved by the OCFI.

2

3. <u>Liquidation</u>. The Corporation cannot estimate the specific time period the Liquidation Period will take, however, the Liquidation Period shall not to exceed six (6) months from the Effective Date.

4. <u>Cessation of Business</u>. Within ninety (90) days of the Effective Date, the Corporation shall cease conducting any business activities, except for the purposes of winding up its business and affairs, marshalling and preserving the value of its assets, and shall distribute the Corporation's assets in accordance with the provisions of this Plan. Among the activities the Corporation is permitted to engage in as part of its winding up its business and affairs is the completion of the Look Back Review, including the filing of Suspicious Activity Reports (SARs) which may be required to be filed by the Corporation as a result of the Look Back Review.

5. <u>Liabilities; Payment to Creditors</u>. (A) During the Liquidation Period, the Administrator shall cause the Corporation to pay, discharge, or otherwise provide for the payment or discharge of, any and all liabilities and obligations of the Corporation as follows:

<u>First</u>, within the first thirty (30) days after the Effective Date, the Administrator, on behalf of the Corporation, shall pay its Depositors that are not Related Persons that have a right to withdraw their Deposits in cash, either because they are demand deposits or time deposits that become due, upon request during the Liquidation Period.

<u>Second</u>, within the first sixty (60) days after the Effective Date, the Administrator, on behalf of the Corporation, shall transfer Deposits of Non-Related Persons to other depository institutions, whether they are Related Persons or not, pursuant to an asset purchase and assumption of liabilities agreement which transfer of deposits shall be conditioned upon receiving the consent of such depositors whose accounts are to be transferred, and in the event such consent is not obtained in a reasonable amount of time, not to exceed thirty (30) days, such deposits shall be paid to the Depositor in cash (wire transfer or check) by the Corporation. For the avoidance of doubt, the consent of Depositors can be obtained either as an affirmative consent or as a negative consent as long as it is not contrary to any applicable law or contractual agreement.

<u>Third</u>, within the first ninety (90) days after the Effective Date, the Administrator, on behalf of the Corporation, shall transfer Deposits of Related Persons to other depository institutions authorized within the jurisdiction to accept deposits and pursuant to an asset purchase and assumption of liabilities agreement which transfer of Deposits shall be conditioned upon receiving the consent of such Depositors whose accounts are to be transferred, and in the event such consent is not obtained in a reasonable amount of time, not to exceed thirty (30) days, such Deposits shall be paid in cash by the Corporation; *provided however*, that such transfer of Deposits of Related Persons shall only occur in the event that the Corporation has established and fully funded the Cash Reserve Account.



<u>Fourth</u>, during the Liquidation Period the Corporation shall pay its Obligations when due either per the terms of a contract or by requirement of law.

<u>Fifth</u>, during the Liquidation Period the Corporation may pay any Obligations before they are due to its Creditors; *provided however*, that such payments shall only occur in the

3

event that the Corporation has established and fully funded the Cash Reserve Account.

(B)    If the Corporation is unable to pay, discharge or otherwise provide for any liabilities of the Corporation during the Liquidation Period, the Corporation may, however, retain cash or cash equivalents in an amount that the Administrator estimates necessary to discharge any unpaid liabilities, Expenses of the Corporation and obligations on the Corporation's books as of the final Liquidation Distribution, payable for the period prior to the final Liquidation Distribution, and pay such contingent liabilities as the Directors and Officers shall reasonably deem to exist against the assets of the Corporation on the Corporation's books.

(C)    No distribution of assets of the Corporation shall be made to the Shareholder until all Deposits are either paid in cash or transferred to another depository institution with the consent of such Depositors as provided herein; *provided however*, that such distribution of assets to the Shareholder shall be allowed subject to Section 6(B) of the Plan and in the event that the Corporation has established and fully funded the Cash Reserve Account.

6.    Disposal and or Sale of Assets. (A) As of the Effective Date, the Corporation shall have the authority to either dispose or sell and liquidate its assets and engage in such other transactions as may be appropriate to its dissolution and liquidation, including, without limitation, obtaining all necessary approvals and authorizations from the OCFI and any other authority having jurisdiction over the Corporation.

(B)    Among the assets to be sold by the Corporation are investments and works of art of the Corporation which shall be sold in exchange for cash. The proceeds of the sale of such assets shall be used to: (i) pay Deposits; (ii) fund the Cash Reserve Account; and (iii) pay Expenses of the Corporation. Any proceeds from the sale of the assets referred to in this subsection (B) after the payments referred to in (i) to (iii) above shall be transferred to the Shareholder after a determination of no-objection from the OCFI to such transfer. The sale of investments and works of arts shall occur as the opportunities present themselves and shall be consummated prior to the las Liquidation Distribution; provided however, that the use of proceeds from those sale transactions shall be subject to the terms of the Plan.

(C)    Within the first fifteen (15) days from the Effective Date, the Administrator shall make a list of Inactive Accounts and within the first thirty (30) days from the Effective Date, the Administrator, on behalf of the Corporation, shall send a communication to the holders of such Inactive Accounts so identified to the last address on file with the Corporation indicating that the Corporation is undergoing a liquidation process and that they have a right to have their Deposits paid in cash or transferred to another depositary institution with their consent. In the event that the Corporation does not receive any response from such holders of Inactive Accounts within sixty (60) days from the Effective Date, such Inactive Accounts shall be transferred to the OCFI.

(D)    Assets of clients of the Corporation held in trust accounts or in custody accounts shall be transferred as per instructions of said clients. Securities held is such accounts shall be transferred to securities accounts designated by such clients, or in the event the client so orders that the securities be sold, such securities will be sold, and the proceeds of such transactions shall be delivered to the client. In the event that securities held by clients in



4

trust accounts or custody accounts at the Corporation are Venezuelan securities or securities subject to sanctions, such transfer of the account or sale of the securities shall be made in accordance with applicable law and regulations and shall be coordinated with the OCFI and federal authorities.

(E)    As soon as is reasonable and practicable after the Effective Date, the Corporation shall transfer and assign all of its remaining assets after the sale of the Corporation's investments and work of arts referred to in subsection (B) above, subject to payment and/or transfer of the Corporation's liabilities as provided in Section 5 and Section 6(B) of this Plan, to the extent of the value of said assets to the Shareholder, in complete liquidation, cancellation and redemption of all of the outstanding capital stock of the Corporation in accordance with the requirements of Act 52 and the regulations promulgated thereunder. Said transfers and assignment shall be commenced on the Effective Date, shall be completed as soon as possible thereafter, and shall be evidenced by such public or private instruments as the Corporation deems necessary in order to perfect and, in the case of real property, to record its title to such assets in the Shareholder. Any such cancellation of the Corporation's capital stock shall be approved by the OCFI as required under the Act 52.

(F)    The Corporation shall cause the Shareholder to endorse for cancellation and deliver to the Corporation the shares of the Corporation owned by it represented by its certificates, which shall be redeemed and canceled by the Corporation in accordance with the requirements of Act 52 and the regulations promulgated thereunder.

7.    Look Back Review. Pursuant to the terms of the MOU, the Corporation commenced a review of customers' accounts in accordance with the requirements of the BSA Rules for the period covering October 1, 2016, through December 17, 2020 (the "Look Back Review") as set forth in the attached **Exhibit C**. Such Look Back Review shall continue pursuant to the Plan and shall be subject to the terms of this Section 7 of the Plan and the attached **Exhibit C**. Other than the Look Back Review and the recitals and fact descriptions in the MOU, all other provisions of the MOU shall be terminated, substituted and superseded by the Plan on the Effective Date, considering the Corporation's decision to enter into the instant liquidation and dissolution process *and further provided* that the Corporation complies with its obligations under this Plan and the representations made herein.

8.    Taxes. On or after the Effective Date the Corporation shall file a request for an administrative determination or ruling with the Department of the Treasury of Puerto Rico confirming that the liquidation of the Corporation is not subject to Puerto Rico taxation pursuant to the Act and the Code in order to provide such determination to the OCFI and the Department of State to cancel the registration of the Corporation in the Registry of Corporations of the Department of State.

9.    Indemnification. The Corporation and the Shareholder, joint and severally, shall continue to indemnify its officers, directors, employees, agents and the Administrator in accordance with its certificate of incorporation, bylaws, and contractual arrangements as therein or elsewhere provided, the Corporation's existing directors' and officers' liability insurance policy and applicable law, and such indemnification shall apply to acts or omissions of such persons in



5

connection with the implementation of this Plan and the winding up of the affairs of the Corporation. The Board is authorized to obtain and maintain insurance as may be necessary to cover the Corporation's indemnification obligations.

10.    Surrender of License. Within ten (10) Business Days after all deposits of the Corporation are either paid to their respective depositors or transferred to a depository institution as provided in Section 5 and Section 6(B) of this Plan and as result there are no deposits outstanding, the Corporation shall notify of such facts to the OCFI and surrender its license as an international banking entity under the Act 52. Upon receipt and confirmation of the surrender of the license to the OCFI, the Corporation shall no longer be prospectively subject to the Act; provided however, that regardless of the surrendering of the license, the Corporation shall be obligated to the full extent to fulfill its obligations pursuant to this Plan and the Look Back Review.

11.    Third Party Administrator. During the Liquidation Period, the Administrator, on behalf of the Corporation, shall have authority to sell, transfer and/or liquidate the Corporation's assets pursuant to the terms of this Plan at such times and in such manner as the Administrator deems advisable. The Corporation shall bear all expenses incurred by it in connection with the carrying out of this Plan including, but not limited to the expenses of the Administrator, all printing, audit, legal, accounting, custodian, and transfer agency fees, and the expenses of any reports. The Corporation estimates that the expenses to be incurred by it during the Liquidation Period, assuming a Liquidation Period of six (6) months, to be approximately $7,904,000.00 or $1,317,333.33 monthly, taking into consideration expenses associated to the Look Back Review, among other expenses. There is no assurance that actual expenses incurred by the Corporation will not be higher than this estimated amount.

12.    Board Constitution and Officers. (A) As of the Effective Date, the Shareholder shall appoint as directors of the Corporation, Gregorio D'Andrea, Juan Carlos Eyherabide and Ramón Ponte, and such directors shall appoint Gregorio D'Andrea as President and Chief Executive Officer, Ana Faría as Secretary and Chief Legal Counsel, Denisse Aracena as Vice President and Chief Compliance Officer, and Jennifer López as Chief Financial Officer and Treasurer.

13.    Employees and Independent Contractors. In connection with effecting the liquidation and dissolution of the Corporation and for the purpose of implementing and assuring completion of the Plan, the Administrator shall cause the Corporation to hire or retain such employees, consultants, independent contractors, agents and advisors as the Board deems necessary or desirable to supervise or facilitate the dissolution and liquidation of the Corporation in accordance with the terms of this Plan. The Corporation has established compensation packages to personnel essential to the implementation of the Plan, however, the Corporation may, in the absolute discretion of the Board, but subject to applicable legal and regulatory requirements, pay the Corporation's officers, employees, consultants, independent contractors, agents, advisors and representatives, or any of them, compensation or additional compensation above their regular compensation, in money or other property, as severance, bonus, or in any other form, in recognition of the efforts they, or any of them, will be required to undertake, or actually undertake, in connection with the implementation of the Plan. The compensation of the directors shall be the same compensation set as of the Effective Date and that compensation shall not be modified without the no-objection of the OCFI. The Corporation shall submit within five (5) Business Days

6

of the execution of this Plan a list of employees, consultants, independent contractors, agents and advisors that will aid in the liquidation of the Corporation for OCFI's knowledge and determination of no objection. If the Corporation does not receive the response from OCFI within five (5) Business Days from notifying the OCFI of such information, the OCFI's no objection shall be deemed as issued. The Corporation shall continue to use consultants, independent contractors, agents and advisors that will aid in the liquidation of the Corporation until and if the OCFI issues an affirmative objection to their continued use by the Corporation.

14.     Notice of Liquidation. As soon as practicable after the Effective Date and to the extent such notice is required under the PRGCL, the Corporation shall mail notice to its known Creditors, at their addresses as shown on the Corporation's records, that this Plan has been approved by the Board, the Shareholder and the OCFI and that the Corporation will be liquidating its assets.

15.     Termination of the Corporation and Corporate Dissolution. (A) The Corporation shall be terminated as reasonably practicable after the Effective Date and the completion of the implementation of the Plan and at that time, a termination date shall be determined by the Board of the Corporation (the "Termination Date").

(B) Pursuant to the PRGCL and after the final Liquidation Distribution, the Corporation shall prepare and file the Certificate of Dissolution, including reference to the Termination Date, with and for acceptance by the Department of State.

16.     Other Filings. As soon as practicable after the final distribution of the Corporation's assets to the Shareholders, the Corporation shall file notice of liquidation and dissolution of the Corporation and any other documents as are necessary to effect the liquidation and dissolution of the Corporation in accordance with the requirements of any applicable securities laws, and any rules and regulations of the Commissioner or any other state agency, including, without limitation, the surrendering of the license under the Act to the Commissioner or withdrawing any qualification to conduct business in any jurisdiction in which the Corporation is so qualified, as well as the preparation and filing of any tax returns, including, but not limited to the Corporation's final income tax returns.

17.     Further Assurances. The Board shall take such further action, prior to, at, and after the final Liquidation Distribution, as may be necessary or desirable and proper based on the advice of the Administrator to consummate the transactions contemplated by this Plan.

18.     Governing Law. This Plan shall be governed and construed in accordance with the laws of the Commonwealth of Puerto Rico.

19.     Severability. Any provision of this Plan that is declared invalid or unenforceable by a court of competent jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof. The headings or titles of the sections of this Plan are used for purposes of reference and they should not affect the construction, interpretation, validity and/or enforceability of this Plan.

[SIGNATURE PAGE IN NEXT PAGE]

7

**IN WITNESS WHEREOF**, the Corporation and the Shareholder hereto have caused this Plan to be approved and executed by their duly authorized officers as August 8, 2022.

**BANCREDITO INTERNATIONAL BANK & TRUST CORPORATION**
**The "Corporation"**

By: _____

Name: Gregorio D'Andrea
Title: President and Chief Executive Office

**BANCREDITO HOLDING CORPORATION**
**The "Shareholder"**

By: _____

Name: Julio M. Herrera Velutini
Title: Chairman

Accepted by:

**THE OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS**

By: _____

Name: Natalia I. Zequeira Díaz, Esq.
Title: Commissioner

Dated: Aug. 9, 2022

8

# EXHIBIT A

## Memorandum of Understanding
### Dated December 21, 2022



9


## MEMORANDUM OF UNDERSTANDING
Between
The Office of the Commissioner of Financial Institutions
And
Bancrédito International Bank & Trust Corporation

This Memorandum of Understanding ("MOU") is made and is effective this ___ day of December 2021 ("Effective Date") by and among Bancrédito International Bank & Trust Corporation (hereinafter referred to interchangeably as "BIBTC" or "IBE"), an International Banking Entity organized and operating pursuant to Act No. 52 of August 11, 1989, as amended, known as the "International Banking Center Regulatory Act"[1] ("Act No. 52") and the Office of the Commissioner of Financial Institutions ("OCFI").

**WHEREAS**, BIBTC, by and through its duly elected and acting Board of Directors ("Board"), has executed a Stipulation to the Issuance of a Memorandum of Understanding ("Stipulation"), dated December __, 2021 that is accepted by the OCFI. With this Stipulation, BIBTC has consented to enter into this MOU, without admitting or denying any findings of unsafe or unsound banking practices or violations of law or regulation relating to weaknesses in management and in the Bank Secrecy Act ("BSA") and Anti Money Laundering Program.

**NOW, THEREFORE**, BIBTC and the OCFI agree as follows:

### ARTICLE I. JURISDICTION

Act No. 4 of October 11, 1985, as amended, known as the "Law of the Office of the Commissioner of Financial Institutions" ("Act No. 4") grants the OCFI the responsibility for monitoring and supervising the financial institutions that operate or do business in Puerto Rico. In conjunction with Act No. 4, the Commissioner administers Act No. 52 and Regulation No. 5653, known as "Regulation of the International Banking Center Regulatory Act" ("Regulation No. 5653"). Article 10(a)(4) of Act No. 4, empowers the Commissioner to "file any legal remedies, actions or procedures necessary or convenient for the implementation of the purposes of this or any other act or regulation whose compliance or supervision has been assigned to him". Act. No. 4 and Act No. 52 thus empower the Commissioner to supervise and regulate the operations of international banking entities organized under Act No. 52.

Section 3 of Act No. 52 provides, as is here pertinent that the Commissioner shall:

...

---

[1] 7 L.P.R.A. §§ 232 et seq.

CENTRO EUROPA BUILDING, 1492 PONCE DE LEON AVE, SUITE 600, SAN JUAN, PR 00907-4024 | PO BOX 11855, SAN JUAN, PR 00910-3855
PHONE: 787-723-3131 | WWW.OCIF.PR.GOV

⊠OCFI

Case 5:23-cv-00575-M-BM   Document 10-1   Filed 11/06/23   Page 18 of 58

(6) supervise, inspect, and audit international banking entities and require from them periodic reports and other information specified in the regulations of the Commissioner;

(7) ...

(8) ascertain the financial security and operating soundness of international banking entities and ensure that they comply with applicable laws and regulations and with any other provision or requirement which the Commissioner may require by order or regulation;

(9) revoke or suspend a license to operate an international financial institution or impose any sanctions he/she may deem necessary and convenient pursuant to the Regulations of the Commissioner; any person whose license has been revoked or suspended, or to whom any other sanction has been imposed, shall have the right to request a hearing pursuant to the regulations provided in Section 20 of this Act;

...

Section 14 of Act No. 52, provides as follows:

Every holder of an international banking entity license shall:

(a) Adopt written business policies and procedures to ensure that the international banking entity complies with the applicable state and federal laws, including this Act, the Bank Secrecy Act, and the USA Patriot Act.

(b) Faithfully comply with the applicable state and federal laws and the regulations applicable to the international banking entity, including this Act, the Bank Secrecy Act, and the USA Patriot Act.

(c) File currency transaction or suspicious activity reports required by the Bank Secrecy Act and the USA Patriot Act, when necessary.

(d) Follow the practice rules and procedures that are necessary in the business to meet the requirements of OFAC, as applicable.

In turn, Section 8 of Act No. 52, provides, as is here pertinent, as follows:

...

(b) Every license renewal application shall be submitted within thirty (30) days before the expiration date of each license. It shall contain: ...

(3) A statement, as provided in the regulations of the Commissioner, undersigned by the chief executive officer or any other executive officer

⊗OCFI

expressly authorized by the Board of Directors of the concerned institution, certifying:

(A) That the international banking entity has implemented the necessary and appropriate procedures and systems to comply with the provisions of the Bank Secrecy Act;

(B) A statement acknowledging the entity's management responsibility to establish in such entity, and to maintain and comply with the Bank Secrecy Act Compliance Program;

(C) That the necessary policies and procedures have been adopted in the entity to comply with the provisions of OFAC, as applicable, and

(D) Any other related information that the Commissioner may require by regulations.

Section 18 (e) of Act No. 52 provides that:

(e) The Commissioner is hereby authorized to:

(1) Impose and collect administrative fines of not less than one hundred dollars ($100) nor more than ten thousand dollars ($10,000) for each violation of the provisions of §§ 232 *et seq.* of this title or of the rules and regulations that may be promulgated thereunder.

(2) Order restitution or refund of payments received in violation of the provisions of §§ 232 *et seq.* of this title or any rules or regulations that may be promulgated thereunder or any other remedy that he/she may deem necessary to achieve the purposes of §§ 232 *et seq.* of this title.

(3) Impose and collect administrative fines, which shall not be less than one hundred dollars ($100) or more than five thousand dollars ($5,000), for each day the international banking entity fails to meet the requirements or carry out the orders of the Commissioner.

While Article 13 of Regulation No. 5653 provides that:

1. ....

2. Penalties

Any violation of the Act or this Regulation shall be punished with the penalties established by the Act, and if the Act does not provide a penalty, the Commissioner may impose the administrative fine which he deems

⊠OCFI

appropriate, which shall not be less than five hundred dollars (U.S. $500) and no more than five thousand dollars (U.S. $5,000) per violation.

## ARTICLE II. PROCEDURAL BACKGROUND

The procedural background since the beginning of the Examination on July 1, 2019, up to the present has been extensive and subject to many events, including the ongoing COVID-19 pandemic. Throughout this period, the parties have exchanged multiple written correspondence and held numerous meetings. As relevant here, BIBTC raised various legal arguments challenging the validity of the processes followed by OCFI, among which were allegations concerning (1) lack of due process, (2) arbitrary and capricious conduct, (3) potential conflicts of interests, (4) protracted examinations, (5) harassment, (6) the scope and extent of the applicable regulatory framework and/or legal landscape, and (7) reputational damages, *inter alia*.

The OCFI maintains its position that the Examination process was carried out in a routine manner, consistent with applicable rules and laws. The OCFI has also thoroughly considered the arguments/allegations raised by BIBTC and (1) strongly disagrees with them, and/or (2) has addressed some of them, where necessary. Furthermore, the OCFI has afforded BIBTC ample opportunities to express its position on regulatory matters during and after the Examination. Every finding has been thoroughly evaluated and discussed with BIBTC at length.

BIBTC acknowledges that it has been advised and is fully aware of its rights, including the right to challenge the relevant processes and the Report of Examination's (ROE) findings through an adversarial administrative process, and has instead voluntarily elected to close this matter, in its entirety, with the execution of the present MOU.

## ARTICLE III. RESULTS OF THE EXAMINATION

The ROE of the IBE for the period starting on October 1, 2016 through March 31, 2019, identified multiple apparent violations of law in BSA areas related to reporting of suspicious activity and foreign bank accounts, and due diligence on foreign correspondent accounts, in addition to significant deficiencies in internal controls, independent testing, and supervision of the BSA analyst, among others, which are summarized as follows:

(1) The ROE identified that the IBE "…is in apparent violation of Section 14(c) of the Act [no. 52] and Section 31 C.F.R. 1020.320 of the U.S. Treasury Department regulations, which requires that SARs should be filed for transactions aggregating $5 thousand or more that involve money laundering or violations of BSA if the [IBE] knows, suspects, or has reason to suspect that the transaction is designed to evade BSA reporting requirements." As relevant here, OCFI determined that the IBE failed to file multiple SARs and reported late twenty-two (22) suspicious activity reports.

(2) The ROE also identified that the IBE "…is in apparent violation of section 14(b) of the Act [no. 52] and Section 31 C.F.R. 1010.610 of the U.S. Treasury Department regulations, which requires the [IBE] to establish a risk-based due diligence program and to conduct enhanced scrutiny of such correspondent accounts to guard against money laundering and to identify and report any suspicious transactions […which]

⊗OCFI

5

shall reflect the risk assessment of the account and shall include, as appropriate, monitoring transactions to, from, or through the correspondent account in a manner reasonably designed to detect money laundering and suspicious activity."

(3) The ROE also identified that the IBE "…is in apparent violation of Section 14(b) of the Act [no. 52] and Sections 31 C.F.R. 1010.350 and 1010.306 (c) (d) of the U.S. Treasury Department's regulations […] due to various filing errors noted in the FBARs as of December 31, 2016, 2017 and 2018."

(4) Furthermore, the ROE identified that the IBE's Bank Secrecy Act (BSA) Compliance Program contains deficiencies and significant weaknesses that need to be addressed by management and the Board, concerning (a) "… current SAR processes for detecting and reporting suspicious activities", (b) internal controls and (c) "[t]he supervision of the BSA analysts that close profile exceptions and flags…" Previous examination weaknesses concerning Customer Due Diligence (CDD) and Enhanced Due Diligence (EDD) remain.

(5) The ROE also identified:

(i) lack of BSA Officer independence and autonomy for SAR decisions.

(ii) lack of critical analysis of the transactions flagged by the IBE's automatic monitoring system, including, but not limited to, the identification of significant disparities, investigation and documentation of potentially suspicious activity, and well-supported conclusions.

(iii) inaccurate BSA risk assessment and errors in the Foreign Bank and Financial Accounts Reports (FBFAR).

## ARTICLE IV. **BOARD OF DIRECTORS**

(1) As of the effective date of this MOU, the Board shall further increase its participation in the affairs of the IBE, assuming full responsibility for the approval and implementation of sound policies and objectives and for the supervision of all BIBTC's activities, consistent with the role and expertise commonly expected for directors of IBE's of comparable size and complexity. This participation shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: adoption or modification of operating policies; individual committee reports; audit reports; internal control reviews, including management's responses; and compliance with this MOU. Board meeting minutes shall document these reviews and approvals, including the names of any dissenting directors.

(2) During the life of this MOU, the Board shall take action to ensure that complete and accurate minutes of Board and committee meetings are maintained; that such minutes adequately address the areas covered in this MOU; and that management reports are sufficient to provide the Board with timely and adequate information necessary for making business decisions on the basis of fully informed and meaningful deliberation.



## ARTICLE V. SPECIAL BSA DIRECTORS' COMMITTEE

(1) Within thirty (30) days from the effective date of this MOU, the Board shall establish a Special BSA Directors' Committee ("BSA Directors' Committee"), consisting of at least three (3) independent members (the "Independent Members"), to oversee the IBE's compliance with BSA Rules and this MOU. None of the IBE's employees, officers, management or shareholders holding a controlling interest of the IBE or any of its affiliates shall be a member of the BSA Directors' Committee, except as detailed below, provided that at all times the majority of the voting interests of the BSA Directors' Committee are held by the Independent Members. The following IBE's employees and officers may participate in the BSA Directors' Committee on an as-needed-basis for purposes of ensuring the IBE's compliance with this MOU and BSA Rules:

- (i) the BSA Officer, who is responsible, among other things, for providing progress reports on BSA related matters and escalating certain information to the BSA Directors' Committee as set forth in this MOU,
- (ii) the Chief Operating Officer, who will be the representative of the IBE's Executive Management in the BSA Directors' Committee, and
- (iii) the General Counsel, whose role and responsibilities will be limited to the drafting and safekeeping of the BSA Directors' Committee Minutes.

Additionally, the names of the members of the BSA Directors' Committee and, in the event of a change of the membership, the name of any new member, shall be promptly submitted in writing to the OCFI for a prior determination of no supervisory objection.

(2) The BSA Directors' Committee shall meet at least on a monthly basis, must maintain minutes of its meetings, and must be available for meetings with OCFI as required by it, including but not limited to meetings with OCFI's examiners.

(3) The BSA Directors' Committee will be primarily responsible for overseeing the IBE's compliance with BSA Rules and this MOU, as set forth herein, and for leading all efforts concerning the look-back review detailed in Article VII of this agreement.

(4) The BSA Directors' Committee shall receive monthly reports from the BSA Officer regarding IBE's actions with respect to the BSA Compliance Plan required in ARTICLE VI. Following such monthly meetings, the BSA Directors' Committee shall prepare and send a report to the Board regarding IBE's adherence to the BSA Compliance Plan, which shall be discussed at each regularly scheduled Board meeting or, should it be necessary, during any extraordinary Board meeting. Such report shall be recorded in appropriate minutes of the Board's meeting and shall be retained in IBE's records.

(5) On a monthly basis the BSA Officer must also escalate and report to the BSA Directors' Committee the following:

- (i) a list of all alerts generated by the IBE's transaction monitoring system for the reporting period,
- (ii) a description of the actions taken to close alerts without filing SARs,

(iii) a list of all transactions that involve officers, employees, or directors of the IBE or any of its affiliates or a family member of any such person and a description of the actions taken to analyze said transactions, and

(iv) a list of accounts that were closed by the BSA Officer, if any.

Due to the confidential and sensitive nature of the information to be included in the reports prepared and escalated by the BSA Officer to the BSA Directors' Committee pursuant to this subsection of Article V, the same shall be excluded from the Committee's reports to the Board. Additionally, the meeting minutes associated to this subsection of Article V shall only include reference to the fact that such information was escalated and reported to the BSA Directors' Committee, but shall not include any details pertaining to the information reported.

(6) Within sixty (60) days of the effective date of this MOU, and thereafter within thirty (30) days of the end of each calendar quarter, or within such other time as required by the OCFI in writing, the BSA Directors' Committee shall submit a written progress report to the Board setting forth in detail the following:

(i) the BSA Compliance Plan (as such term is defined in Article VI of this MOU);

(ii) specific actions taken and needed to comply with each Article of this MOU;

(iii) the results and status of those actions; and

(iv) any other item that the IBE's Management wishes to report and/or escalate to the Board through the IBE's Chief Operating Officer or its BSA Officer.

(7) The Board shall forward a copy of the BSA Directors' Committee's report, with any additional written comments made by the Board, to the OCFI within ten (10) days of receiving such report.

## ARTICLE VI. BSA COMPLIANCE PLAN

(1) Within sixty (60) days from the effective date of this MOU, the IBE shall further develop and, implement a written plan ("BSA Compliance Plan") for administration of a program reasonably designed to ensure and maintain compliance with the recommendations and findings included in the ROE and the laws and regulations related to the Bank Secrecy Act ("BSA"), including, but not limited to, Act No. 52, subchapter II of Chapter 53 of Title 31 of the United States Code, and its implementing rules issued by the U.S. Department of Treasury, 31 C.F.R. Part 25 1020; the regulations of the Office of Foreign Asset Control ("OFAC"), 12 C.F.R. Part 500, (collectively, "BSA Rules"). The Board shall review, approve, and implement the BSA Compliance Plan. After the Board has approved the BSA Compliance Plan, the review and approval shall be recorded in the minutes of the Board. Thereafter, the Board shall take appropriate action to enable the IBE to comply with the BSA Rules. The BSA Compliance Plan will be submitted to the OCFI.

(2) At a minimum, the BSA Compliance Plan shall require the review, enhancement, or restatement, as appropriate, of a system of internal controls, including policies and procedures

⊗OCFI

reasonably designed to detect and monitor all transactions to ensure compliance with the BSA Rules. Such controls shall specifically address, at a minimum:

(i) Procedures to thoroughly investigate flagged transactions by the IBE's automatic monitoring system, including suspicious activities involving clients of correspondent banks;

(ii) The opening and monitoring of accounts with frequent wire and check activity, including accounts of clients of correspondent banks, and the monitoring of high-risk and suspicious activities for all types of accounts, products, services, and geographic areas;

(iii) Procedures for the IBE's Customer Identification Program ("CIP") and account opening procedures, including, but not limited to: policies and procedures with respect to high-risk accounts and customers, including the adequacy of methods for identifying and conducting due diligence on high-risk accounts and customers at account opening and thereafter, and for monitoring high-risk customer relationships on a transaction basis as well as by account and customer;

(iv) Procedures to request from all clients, direct accounts and correspondent accounts, and confirm compliance with account opening agreements for the completion of their Know Your Customer (KYC) and Know your Customer Customers (KYCC) documentation. The IBE shall make sure that such information is gathered at account opening and updated, as needed, from time to time. Correspondent accounts shall be reminded and monitored about the importance of having this information on file on a timely basis, so as to avoid, to the extent possible, having to obtain KYC and KYCC information concurrent to a transaction;

(v) Policies, procedures, and systems for identifying, evaluating, monitoring, investigating, and reporting suspicious activity, particularly including transactions involving high-risk customers or accounts, and/or high-risk jurisdictions, and the appropriateness of the IBE's criteria for designating an account as high-risk and assessing the IBE's procedures and systems for identifying and monitoring customer transactions in accordance with the BSA Rules;

(vi) The designation/ratification of a senior official ("BSA Officer") responsible for coordinating and monitoring day-to-day compliance with the BSA, and adequate, qualified staffing in the BSA area;

(vii) Requirements for independent annual testing for compliance with the BSA Rules which include an independent determination of high-risk accounts and sufficient transaction testing for said high-risk accounts and monitoring system for suspicious activities detection and reporting. The consultant shall prepare formal work programs and work papers to document the work performed and have direct line of reporting to the Board or Board's Committee. The scope of the testing procedures to be performed, and testing results, shall be documented in writing and approved by the Entity's Board or its designee. The testing procedures shall be consistent with the guidance for independent testing as set forth in the Federal Financial Institutions Examination Council (FFIEC) BSA/AML Examination Manual, and at a minimum, should include the following:

a. An evaluation of the overall adequacy and effectiveness of

⬡OCFI

the BSA Compliance Program;

b. Compliance testing for all appropriate business lines conducted by qualified staff independent of the Entity's compliance, BSA/AML and OFAC functions;

c. Review of the Entity's risk assessment for reasonableness;

d. Testing to verify BSA recordkeeping and reporting requirements;

e. CIP and beneficial owner implementation, adequacy of CDD and EDD policies, procedures, and processes;

f. Review of the adequacy of the Entity's Training Program;

g. Appropriate transaction testing, with particular emphasis on high risk operations;

h. Evaluation of management's efforts to resolve violations and deficiencies noted in previous audits and regulatory examinations;

i. Assessment of the overall process for identifying and reporting suspicious activity, including a review of filed or prepared SARs to determine their accuracy, timeliness, completeness, and effectiveness of policies;

j. Accuracy and completeness of account risk profiles; and

k. Implementation of an appropriate training program for the IBE to assure that appropriate personnel is regularly trained to comply with the BSA Rules.

(3) The IBE shall at all times provide for the continued administration of the BSA Compliance Plan, designed to assure and monitor compliance with the BSA Rules.

## ARTICLE VII. SUSPICIOUS ACTIVITY, OFAC AND FOREIGN CORRESPONDENT ACCOUNTS REVIEW

(1) Within thirty (30) days of the execution of this MOU, the Board shall submit to the OCFI for a prior determination of no supervisory objection, a list of three (3) qualified, independent, third-party consultants that have not been previously engaged by the IBE, to perform a look-back in accordance with the requirements of the BSA Rules. Subject to the scope of

⬧OCFI

engagement presented to OCFI for a prior determination of no supervisory objection discussed further below, the Look-Back will include for the period covering October 1, 2016 through December 17, 2020:

(i) a review of all customer (individuals and entities) accounts and transactions in excess of $2,500 and provide a written report on the IBE's suspicious activity monitoring ("SAR Look-Back") in order to determine whether suspicious activity was timely identified by the IBE, and if appropriate to do so, was timely reported by the IBE in accordance with 12 C.F.R. § 21.11 and 31 C.F.R. § 1010.306; and

(ii) a review of all accounts and transactions from foreign correspondent accounts ("Correspondent Accounts Look-Back") in excess of $2,500 in order to determine whether suspicious activity was timely identified by the IBE, and if appropriate to do so, was timely reported by the IBE in accordance with 12 C.F.R. § 21.11 and 31 C.F.R. § 1010.306.

Within forty-five (45) days of receiving OCFI's prior determination of no supervisory objection and before conducting the "SAR Look-Back" and the Correspondent Accounts Look-Back, the Board shall also submit, for a prior written determination of no supervisory objection, the proposed scope of the engagement that addresses the requirements of this Article and includes a list of the customers, accounts, and alerts selected for review. Transactions reviewed by OCFI examiners as part of the examination resulting in the ROE and that were not ultimately included in the list of transactions the OCFI has herein requested the IBE to file a SAR, should not be excluded from the universe of transactions to be considered for review by the third-party consultant, consistent with subsections (i) and (ii) above (the "Scope of the Look-Back Review"). Moreover, all system-generated alerts which the IBE determined it would not file a SAR shall be included as part of the universe of transactions to be considered for review by the third-party consultant as part of the Look-Back scope and methodology.

(2) The purpose of the SAR Look-Back and the Correspondent Accounts Look-Back is to determine whether additional SARs should be filed by the BSA Officer and informed to the IBE's Special BSA Director's Committee for any previously unreported suspicious activity; to review the quality and accuracy of previous SAR filings to determine whether corrections or amendments are necessary to ensure that the suspicious activity identified was accurately reported in accordance with the BSA, particularly to determine whether (i) the SAR narrative clearly identifies the *who, what, where, when* and *why* the activity is considered suspicious; (ii) the method of operation (or how?) was included in the narrative; and (iii) that the narrative does not equate to a "defensive SAR" filing either to prevent criticism from regulators or as a response to an ongoing or completed examination; and to identify any accounts whose BSA/AML risk rating should be reevaluated including without limitation, any account owned by shareholders, officers, employees, directors of the IBE or any of its affiliates.

(3) After OCFI has advised the IBE that it does not take supervisory objection to the proposed consultant(s) or scope of the review, the Board shall engage one or more of the consultants to perform the SAR Look-Back and Correspondent Accounts Look-Back. The consultant(s) shall be available for periodic meetings with OCFI.

⊗OCFI

(4) The scope of the SAR Look-Back and the Correspondent Accounts Look-Back shall also include, in addition to the transactions identified in Paragraph 1 of this Article, coverage of all of the IBE's customer and account activity for the period covering October 1, 2016 through December 17, 2020 for accounts:

> (i) Owned by officers, employees, or directors of the IBE or any of its affiliates (as the term "affiliate" is defined in 12 U.S.C. § 371c(b)(1)), or a family member of any such person;
>
> (ii) For which the IBE received a law enforcement subpoena or a demand request.

(5) Within one hundred and eighty (180) days of receiving no supervisory objection to the consultant(s) and Scope of the Look-Back, the consultant shall provide the Board with a written report that contains a list of any SARs that should be filed or existing SARs that should be modified to meet the requirements of 31 C.F.R. § 1020.320, a list of accounts that represent excessive risk for BSA/AML compliance, and a conclusion about the effectiveness of the IBE's suspicious activity monitoring. The SAR Look-Back report and the Correspondent Accounts Look-Back report should also, among other things, describe the methodologies and tools used in conducting the reviews, describe the process followed for investigating customers and customer activities, and provide a summary of the number and types of customers and accounts reviewed, number of customers and accounts requiring additional investigation, number of customers warranting SAR filings or modifications to existing SAR filings, and the number of customers where it was determined not to file SARs. The Board shall immediately provide a copy of the final written report of the findings and recommendations from the SAR Look-Back to the OCFI. The supporting materials and work papers associated with the SAR Look-Back and the Correspondent Accounts Look-Back shall be made available to the OCFI upon request.

(6) The Board shall also ensure that the IBE files, or modifies, as appropriate, any SARs in accordance with the requirements of 31 C.F.R. § 1020.320, and consider whether the IBE should continue its relationship with any accounts which represent excessive risk for BSA/AML compliance, including, without limitation, any account owned by shareholders, officers, employees, or directors of the IBE or any of its affiliates.

(7) Within thirty (30) days after completion of the detailed review, the BSA Officer shall prepare and file any additional SARs that are necessary based upon the review.

(8) Based upon the results of the SAR Look-Back and the Correspondent Accounts Look-Back, the OCFI may require an expanded review of the IBE's accounts and/or alerts.

## ARTICLE VIII. RISK ASSESSMENT

(1) The Board shall update the IBE's overall BSA risk assessment of the IBE's compliance with the BSA Rules on or before March 31, 2022 to consider all major risks, including but not limited to products, services, types of customers, operations, markets served and geographic

⊠OCFI

locations, with analysis of the major risk categories. The Board shall specify in the Compliance Plan how frequently the risk assessment will be updated or reassessed.

(2) As to the IBE's de-risking efforts of Venezuelan clients, as approved in the June 21, 2018 and May 30, 2019 Board Resolutions, within thirty (30) days from the effective date of this MOU the IBE shall confirm to the OCFI whether such de-risking efforts have concluded and the specific actions taken by the IBE as part of said de-risking. The IBE shall also confirm, within thirty (30) days from the effective date of this MOU, that the correspondent banks with which the IBE maintains a commercial relationship were made aware of the IBE's de-risking strategy, including the time and method by which they were made aware. To the extent said banks have not been made aware of the IBE's de-risking strategy, they should be made aware in writing within thirty (30) days from the effective date of this MOU. The IBE should also take all necessary measures to incorporate said de-risking strategies into the ongoing agreements with such banking entities, which, at a minimum, shall include a representation and covenant confirming that the relevant correspondent banks will comply with the IBE's de-risking strategy as it relates to transactions processed through the IBE.

(3) Within one hundred and eighty (180) days from the effective date of this MOU, the IBE shall also conduct a risk assessment of the customers through an appropriate risk rating system which shall ensure that the risk level of the IBE's customers is accurately identified based on the potential for money laundering or other illicit activity posed by the customer's activities, with consideration given to the purpose of the account, the anticipated type and volume of account activity, types of products and services offered, and locations and markets served by the customer. The IBE shall ensure that risk ratings are accurate and well supported through qualitative and quantitative data. The risk assessment shall be validated by the consultant retained for the look-back reviews.

## ARTICLE IX. BSA, AML, AND OFAC POLICIES

(1) Within ninety (90) days from the effective date of this MOU, the IBE shall revise and enhance the system of internal routine and controls, taking into consideration BIBTC size and risk profile, and in accordance with the procedures described in FFIEC BSA/AML Examination Manual (Manual), to ensure accuracy and effectiveness and enable the IBE to comply with the BSA/AML and OFAC Rules including, but not limited to, the monitoring of high-risk and suspicious activities for all types of accounts, customer products, services, and geographic areas.

(2) Within ninety (90) days from the effective date of this MOU, the Board shall revise and enhance its BSA, Anti-Money Laundering ("AML"), and OFAC policies, procedures, and practices, taking into account the observations and recommendations presented in the ROE and considering the IBE's size and risk profile, to, at a minimum, provide for:

- (i) Methods of determining, reviewing, and validating risk ratings of customers, with standards for periodic reassessments;
- (ii) Comprehensive monitoring of high-risk accounts, with full utilization of account monitoring software, which shall provide:
    - a. parameters to determine which customers require further review;
    - b. a tracking mechanism to assist the reviewer to identify customers



with a pattern of structuring or engaging in suspicious activity;
  c. monitoring and aggregate all activities for proper analysis;
  d. that the monitoring of sales of monetary instruments includes a review of common payees; and
  e. that monetary instrument logs identify the amount of currency used for the purchase of the instrument and the customer's name and account number, if applicable.

  (iii) Adequate systems for account segregation, when applicable in accordance with appropriate regulations, to ensure sufficient data to determine if SARs should be filed;
  (iv) Standards for documentation of new accounts to capture sufficient data for customer due diligence, with specification of the time and responsibility for obtaining missing documentation; and
  (v) Methods of enforcing the IBE's BSA, AML, and OFAC policies, procedures, and practices with consequences specified for noncompliance.
  (vi) Policies, procedures and processes requiring the periodic review of, and adjustment to, its BSA and OFAC staffing and resources.

(3) Within ninety (90) days from the effective date of this MOU, the Board shall:

  (i) Confirm to the OCFI the scope and extent of the World-Check and Regulatory Data Compliance database subscriptions used by the IBE;
  (ii) Analyze whether said databases or their underlying features need to be expanded to adequately monitor the IBE's high-risk accounts and customers;
  (iii) Inform the OCFI of the IBE's decision to expand its existing subscription coverage;

(4) The IBE agrees to conduct periodic reviews of negative news concerning all customers, including officers, employees, or directors of the IBE or any of its affiliates or a family member of any such person.

## ARTICLE X. DUE DILIGENCE PROGRAM

(1) Within ninety (90) days from the effective date of this MOU, the IBE shall review, enhance, improve and/or implement a written Customer Due Diligence ("Customer Due Diligence or CDD") Program. At a minimum, the CDD Program shall provide for a risk focused assessment of the customer base of the IBE to determine the appropriate level of Enhanced Due Diligence ("EDD") necessary for those categories of customers that the IBE has reason to believe pose a heightened risk of suspicious activities at or through the IBE and which addresses the observations enumerated in the ROE. The CDD Program shall provide for, at a minimum:

  (i) Time limits for IBE personnel to respond to account activity exceptions;
  (ii) Time limits for determining if exceptions require a SAR;
  (iii) Identification of customers requiring site visitations and frequency of visitations (or alternative means for an interview);
  (iv) Periodic review of customer activities by type and volume. The purpose of these reviews is to determine if the customer's activity is reasonable, CDD information is current and complete, and the customer risk rating is accurate. Quality assurance



processes must evaluate the accuracy and comprehensiveness of review documentation. Standards and processes shall be established for elevating reviews for additional management consideration regarding increased monitoring, additional due diligence or account closure.

(v) Obtaining and analyzing a sufficient level of customer information at account opening to establish customer profile, assist and support the risk ratings assigned and obtain additional information such as the purpose of the account, source of funds and wealth, the beneficial owners of the account, customer's occupation or type of business, financial statements, bank references, domicile of the customer's business, place of employment or place of business, description of primary trade area of customer or beneficial owner, description of the business operations, the anticipated volume of transactions, total sales, a list of major customers and suppliers, and explanations for changes in account activity should be required and collected for that customer's profile;

(vi) A process for documenting and supporting the analysis conducted under the CDD process, including a process for validating risk ratings assigned at account opening, and resolving issues when insufficient or inaccurate information is obtained;

(vii) An appropriate level of ongoing monitoring commensurate with the risk level to ensure that the IBE can reasonably detect suspicious activity and accurately determine which customers require EDD; and

(viii) A process to reasonably answer the alerts, adequately archive supporting documentation, and ensure the timely identification and accurate reporting of known or suspected criminal activity, as required by the suspicious activity reporting provisions.

## ARTICLE XI. ENHANCED DUE DILIGENCE (EDD) PROGRAM

(1) Within ninety (90) days from the effective date of this MOU, the IBE shall review, enhance, improve and/or implement EDD policies, procedures and processes to conduct EDD necessary for those categories of customers that pose a heightened risk of suspicious activity, including but not limited to, designated high risk accounts. At a minimum, the EDD Program shall include the following:

(i) Procedures to determine the appropriate frequency for conducting ongoing reviews and analysis, based on customer risk level with appropriate documentation in order to understand the normal and expected transactions of the customer;

(ii) Procedures to determine the appropriate documentation necessary to confirm the identity and business activity of the customer;

(iii) Procedures to ensure the identification and timely, accurate, and complete reporting of known or suspected criminal activity;

(iv) Procedures to collect and document additional information on high-risk customers when additional information is not present in the customers' files. The information collected must provide the BSA Officer and the IBE management with a sufficient understanding of anticipated high-risk customer transactions;

(v) A methodology for identifying additional information requirements when sufficient

⊞OCFI

information is not present in customer files to enable the IBE to understand the nature and purpose of the customer relationship;

(vi) Procedure for high-risk accounts for which the IBE must obtain, among other information, a narrative description of the business operations of complex customer relationships, such as those with multiple business activities including obtaining and analyzing financial information to understand the source of funds and reasonableness of account activity; and

(vii) Procedures to determine whether on-site visits to collect and verify information for the customer profile are warranted.

(2) Moreover, the IBE shall also, at a minimum, confirm that the foreign correspondent banks doing business with the IBE adopt and implement a similar customer Due Diligence Program.

## ARTICLE XII. DUE DILIGENCE PROGRAM FOR CORRESPONDENT ACCOUNTS FOR FOREIGN FINANCIAL INSTITUTIONS

Within ninety (90) days from the effective date of this MOU, the IBE shall review, enhance, improve and/or implement an adequate due diligence program for foreign correspondent accounts of foreign financial institutions in order to scrutinize transactions to detect suspicious activity and manage the IBE's BSA risks. The due diligence program must include specific policies, procedures, and controls for identifying, documenting, monitoring, and reporting suspicious foreign correspondent bank activities. The due diligence program needs to include reasonable steps to conduct enhanced scrutiny of high-risk foreign correspondent bank accounts.

Within ninety (90) days from the effective date of this MOU, the IBE shall also:

(1) Implement controls reasonably designed to improve compliance with BSA/AML Requirements regarding the IBE's correspondent banking business line, including, at a minimum:

    a. Developing or enhancing a due diligence program that includes "appropriate, specific, risk-based, and where necessary, enhanced policies, procedures, and controls that are reasonably designed to enable the [IBE] to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account." 31 C.F.R. § 1010.610(a);

    b. Monitor transactions to, from, or through the correspondent account in a manner reasonably designed to detect money laundering and suspicious activity, including obtaining information about the identity of the ultimate sender or recipient of the funds. 31 C.F.R. § 1010.610(b)(l)(ii) & (iii)(A). The written program should include reasonable steps to conduct enhanced scrutiny of high-risk foreign correspondent bank accounts;

    c. Specific actions taken to comply with paragraphs (iv) a and b, including the results and status of those actions;

    d. Implement processes for detection, identification, analysis, investigation,



documentation, and reporting suspicious activities, particularly including transactions involving high-risk customers or accounts, and high-risk jurisdictions. Strengthen procedures for alert investigations to establish controls and oversight over suspicious activity analysts that close exceptions and flags. Such alerts must include a detailed analysis of the investigation and not general descriptions.

(2) Conduct a review and update of all correspondent account's CDD and EDD to determine whether appropriate information is included, current activities are reasonable and within expected activities of customer profile, and amendments to the Customer Agreement are in place.

(3) The IBE shall submit to the OCFI, within the aforementioned timeframe, proposed enhancements to its due diligence program to reasonably obtain information about the identity of the ultimate sender or recipient of the funds, including the identity of the counterparties to a transaction with a client of the IBE's client, particularly for those transactions that the IBE's system raises an alert or red flag.

## ARTICLE XIII. SUSPICIOUS ACTIVITY REPORTING (SAR)

Within ninety (90) days from the effective date of this MOU, the IBE shall review, enhance, improve and/or implement written policies, procedures, and programs for monitoring, detecting, reviewing, and reporting suspicious activity in accordance with 31 C.F.R. §1020.320 and Section 14(c) of Act No. 52. The BSA requires banks to report transactions that involve or aggregate to at least $5,000, that are conducted "by, at, or through" the bank, and that the bank "knows, suspects, or has reason to suspect" are suspicious. A transaction is suspicious if the transaction: (a) involves funds derived from illegal activities, or is conducted to disguise funds derived from illegal activities; (b) is designed to evade the reporting or recordkeeping requirements of the BSA or regulations under the Act; or (c) has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.

## ARTICLE XIV. REPORTS OF FOREIGN BANK AND FINANCIAL ACCOUNTS (FBFA)

BIBTC must improve FBAR procedures and processes to ensure accurate and complete filing of Foreign Bank and Financial Account Reports (FBFARs).

## ARTICLE XV. TRAINING

(1) Within thirty (30) days from the effective date of this MOU, the IBE shall identify staff positions and personnel whose duties, assignments, and responsibilities call for knowledge of the compliance requirements for BSA, AML, and OFAC regulations. Such personnel shall include, but not necessarily be limited to, directors, executive officers, department heads, supervisors, loan officers, loan operations staff, tellers, bookkeepers, couriers, proof operators, information technology staff, and wire-transfer staff.

⊗OCFI

(2) Within ninety (90) days from the effective date of this MOU, the IBE shall develop a comprehensive training program that shall have a general component for all directors and staff and specific components that are tailored to the needs of specific positions, departments, and personnel, to ensure, among other things, their awareness of their responsibility to comply with the requirements of the BSA Rules; relevant examples to identify, analyze and investigate apparent red flags for money laundering, terrorist financing, and detection of suspicious activity, and type of information and supporting documents required; current developments and changes to the BSA, any related regulation, internal policies, procedures, processes, monitoring systems, accurate recordkeeping, and form completion. The training program shall provide for both initial and periodic refresher training and shall specify who is responsible for dissemination of changes in BSA, AML, and OFAC requirements and in what media and time notifications of changes are to be made. Also, the training program should provide for adequate and targeted training for the BSA Officer; which should include subject matter conferences and/or seminars.

(3) The training program shall require documentation of attendance at training, with full explanations of absences and notation of when absentees will be trained. Training and testing materials, the dates of training sessions, and attendance records should be maintained.

(4) The comprehensive training program shall be approved by the Board and forwarded to the OCFI, with the progress report required by this MOU.

## ARTICLE XVI. WIRE TRANSFER TRANSACTIONS

(1) Within ninety (90) days from the effective date of this MOU, the IBE shall enhance policies, procedures and processes with respect to wire transfer activities and recordkeeping that, at a minimum, include the following:

(i) Complete information of beneficiaries and originators is obtained and maintained, as required by 31 C.F.R. 103.33;

(ii) Establish monitoring systems and parameters, taking into account the IBE's size and risk profile, to identify and report suspicious activity. Such systems and parameters shall, at a minimum, include:

a. parameters that will generate exception reports capturing customer and non-customer (if any) wire transfer activities that take into account aggregate activities that could reasonably be construed as attempts to circumvent the $3,000 reporting threshold; and

b. an aggregation system or parameter that would capture and report wire transfers occurring at the end of a month and the beginning of the following month;

(iii) A requirement that wire transfers of customers be processed through

⊞OCFI

their accounts;

(iv) A requirement that customer identification information be accurately and completely recorded and properly matched to the information on the wire transfer applications;

(v) A requirement that monthly exception reports are reviewed for suspicious activity, and appropriately followed up.

## ARTICLE XVII. BSA OFFICER

(1) Within thirty (30) days from the effective date of this MOU, the IBE's Board, executive leadership, and management must ensure that the BSA Officer has the sufficient qualifications, authority, independence, time, staff and resources to fulfill the duties and responsibilities of the position and ensure the IBE's compliance with the BSA and related matters, including, without limitation, the identification of timely, accurate and complete reporting to law enforcement and supervisory authorities of unusual or suspicious activity, or known or suspected criminal activity perpetrated against or involving the IBE.

(2) The BSA Officer shall report directly to the Board or to the BSA Directors' Committee established by the Board pursuant to the provisions of this MOU. The Board shall ensure the BSA Officer has the necessary authority to implement all aspects of the BSA Compliance Plan. The BSA Officer shall provide monthly comprehensive written reports to the BSA Directors' Committee regarding the IBE's adherence to the BSA Compliance Plan and this MOU.

(3) Within **ten (10) days** from the effective date of this MOU, the BSA Officer shall file all SARs discussed between the IBE and OCFI during and after the Examination, provided that the IBE has not done so before the execution of this agreement.

## ARTICLE XVIII. CIVIL MONEY PENALTY

(1) The IBE shall pay an administrative money penalty in the total amount of **FIVE THOUSAND DOLLARS ($5,000.00)** for violations incurred under Section 14 (b) of Act No. 52, as identified in the ROE.

(2) The IBE shall pay an administrative money penalty in the total amount of **NINETY-TWO THOUSAND DOLLARS ($92,000.00)** for violations incurred under Section 14 (c) of Act No. 52, as identified in the ROE.

(4) The total amount of both administrative money penalties is **NINETY-SEVEN THOUSAND DOLLARS ($97,000.00)** and shall be paid upon the execution of this MOU through a certified check payable to the Secretary of the Puerto Rico Treasury Department. Pursuant to Section 3.20 of Act No. 38-2017, as amended, known as the "Uniform Administrative Procedure Act of the Government of Puerto Rico" ("Act No. 38-2017"), the penalty imposed herein will accrue interest at the rate of 4.25% per annum, from the date on which payment is due until it is finally and totally satisfied.



## ARTICLE XIX. PROGRESS REPORTS

(1) Within thirty (30) days from the end of the first quarter following the effective date of this MOU, and within thirty (30) days from the end of each quarter thereafter, the IBE shall furnish written progress reports to the OCFI detailing the form, content, manner and results of any actions taken to secure compliance with this MOU. Such reports must be reviewed by the Board and made part of the Board minutes or resolutions. This requirement for progress reports should continue until the commencement of the next examination performed by the OCFI to the BIBTC, unless previously modified or terminated in writing by the Commissioner or it may be discontinued when the corrections required by this MOU have been accomplished and the OCFI has released the IBE in writing from making further reports.

## ARTICLE XX. NOTIFICATION REQUIREMENT

(1) The IBE shall notify OCFI of any criminal, civil, administrative, or regulatory investigation, inquiry, or action, of the IBE or its current directors, officers, employees, consultants, representatives, and agents related to the IBE's compliance with sanctions and anti-money laundering laws, to the extent permitted by the agency conducting the investigation or action and applicable law. It is understood that the IBE shall promptly notify the OCFI of (a) any deficiencies, failing, or matters requiring attention with respect to the IBE's BSA/AML compliance program identified by any United States regulatory authority within ten (10) business days of any such regulatory written notice; and (b) steps taken or planned to be taken by the IBE to address the identified deficiency, failing, or matter requiring attention. The OCFI may, in its sole discretion, direct the IBE to provide other reports about its BSA/AML compliance program as warranted.

## ARTICLE XXI. BINDING EFFECT OF THIS MOU

(1) This MOU is binding on the IBE, its successors, assigns, directors, officers, employees, and agents (the "IBE Parties") and the OCFI but specifically does not bind any other component of the Puerto Rico Department of Justice, other local agencies, or any federal or foreign law enforcement or regulatory agencies, or any other authorities. This MOU does not bind any affiliates or subsidiaries of the IBE but is binding on the IBE itself. To the extent the IBE's compliance with this agreement requires it, the IBE agrees to ensure that its wholly-owned subsidiaries, and any successors and assigns, comply with the requirements and obligations set forth in this MOU, to the full extent permissible under applicable laws and regulations.

## ARTICLE XXII. NO ADMISSION OR DENIAL OF LIABILITY OR VIOLATION.

The parties acknowledge that entering into this MOU and taking any actions pursuant thereto does not constitute an admission or denial of liability and/or violation.

⬡OCFI

### ARTICLE XXIII. OTHER ACTIONS

(1) Nothing herein shall preclude the Commonwealth of Puerto Rico, its departments, agencies boards (except OCFI to the extent the IBE is not in default of this MOU), commissions, authorities, political subdivisions, and corporations, or any other federal or state agency, from asserting any claims, causes of action, or applications for compensatory, nominal, and/or punitive damages, administrative, civil, criminal, or injunctive relief against BIBTC from claims, causes of action, actions, administrative orders, enforcement actions and/or complaints arising from the matters covered in the IBE's ROE.

(2) This MOU shall not bar, stop, or otherwise prevent the OCFI from taking any action against the IBE Parties, including but not limited to, the imposition of civil money penalties for matters outside the scope of the IBE's ROE.

(3) Except as explicitly provided in this MOU, nothing herein is intended to or shall be construed to have created, compromised, settled, or adjudicated any claims, causes or action, or rights of any person whomsoever, other than as between the OCFI and the IBE Parties in accordance with this MOU. This MOU shall be binding upon the IBE Parties, its successors and assigns thereof with respect to all conduct subject to the provisions above and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions.

(4) Nothing in this MOU shall preclude the OCFI from: (a) taking adverse action based on other conduct concerning matters outside the scope of the IBE's ROE; (b) taking this MOU and the conduct described above into account in determining the proper resolution of action based on other conduct concerning matters outside the scope of the IBE's ROE; (c) taking any and all available steps to enforce this MOU; (d) taking any action against other entities or individuals, regardless of any affiliation or relationship between the IBE and the entities or individuals, or (e) be construed to limit the OCFI's jurisdiction in any other proceeding after its issuance.

(5) The provisions of this MOU shall remain effective and enforceable except to the extent that, and until such time as, any provision has been modified, terminated, suspended, or set aside in writing by the Commissioner, whether upon the request of the IBE or otherwise.

(6) The IBE is hereby given notice that, pursuant to the provisions of Article 20(c) of Act No. 4, the OCFI may impose an administrative fine not greater than Five Thousand Dollars ($5,000.00) for each day of non-compliance with the orders issued under the provisions of Act No. 4, up to a maximum of Fifty Thousand Dollars ($50,000.00). In the event of total or partial non-compliance with this MOU, the OCFI, in support of the statutory jurisdiction granted by Act No. 4, may request the Court of First Instance, San Juan Superior Section, to enforce the same, under penalty of contempt, and to impose fines and sanctions in addition to the ends the OCFI may deem to be proper, with any other determination which is proper as a matter of law.

IN WITNESS WHEREOF, the parties hereto have executed this MOU on the day and year first above written, by their duly authorized officer or designated agent. A certified copy of the resolution of the board of directors of the IBE authorizing the execution of this MOU is attached hereto and made a part hereof.

▧OCFI

Dated this ___ day of December 2021.

Board of Directors
Bancrédito International Bank and Trust Corp.
San Juan, Puerto Rico

Signatures of Directors                                    Date

_____          _____
Julio M. Herrera Velutini

_____          _____
Frances Díaz Fossé

_____          _____
Juan C. Eyherabide

_____          _____
Ramón Ponte

_____          _____
Jesús Méndez

_____          _____
Gregorio D'Andrea

_____
Natalia I. Zequeira Díaz, Esq.
Commissioner
Office of the Commissioner of Financial Institutions

All communications regarding this Memorandum shall be sent to:
Natalia I. Zequeira Díaz
Email: nataliaz@ocif.pr.gov

Office of the Commissioner of Financial Institutions
Estación Fernández Juncos
PO Box 11855 San Juan, PR 00910-3855

⬧OCFI

# EXHIBIT B

## Related Parties

BRITANNIA BANK & TRUST LTD *,**
BRITANNIA GLOBAL INVESTMENTS LIMITED *,**
BRITANNIA GLOBAL MARKETS LIMITED *,**
CHATELROUX CORPORATION
BANCREDITO HOLDING CORPORATION
JULIO MARTIN HERRERA VELUTINI
MELANIE ODETTE NENNIG RUHS
ISABELA HERRERA BELLO
JULIO CESAR HERRERA BELLO
GILDA RODRIGUEZ
CARLOS ALBERTO HERRERA
JOSE FRANCISCO HERRERA
MARIA FERNANDA BELLO PACHECO



---

\* Only for funds for their own account and not funds of clients of such Britannia entities.
** These Britannia entities are affiliates of Britannia Financial Group Limited, that is owned by a UK Trust in which Julio Cesar Herrera Bello, Isabela Herrera Bello and Melanie Odette Nennig Ruhs are the ultimate beneficial owners (UBOs)

## EXHIBIT C

### Look Back Review

(A)     The Look Back Review shall continue pursuant to the Plan and shall be subject to the terms of this **Exhibit C** and shall include:

(i)     a review of all customer (individuals and entities) accounts and transactions in excess of $2,500 and provide a written report on the Corporation's suspicious activity monitoring ("<u>SAR Look-Back</u>") in order to determine whether suspicious activity was timely identified by the Corporation, and if appropriate to do so, was timely reported by the Corporation in accordance with 12 C.F.R. § 21.11 and 31 C.F.R. § 1010.306; and

(ii)     a review of all accounts and transactions from foreign correspondent accounts ("<u>Correspondent Accounts Look-Back</u>") in excess of $2,500 in order to determine whether suspicious activity was timely identified by the Corporation, and if appropriate to do so, was timely reported by the Corporation in accordance with 12 C.F.R. § 21.11 and 31 C.F.R. § 1010.306.

The Look Back Review shall have the scope proposed by the Corporation to OCFI on April 8, 2022 and agreed and approved by the OCFI on May 10, 2022. For the avoidance of doubt, transactions reviewed by OCFI examiners as part of the examination resulting in the OCFI's Report of Examination of the Corporation for the period starting on October 1, 2016 through March 31, 2019 and that were not ultimately included in the list of transactions that OCFI already requested the Corporation to file a SAR, should not be excluded from the universe of transactions to be considered for review by the Consultant, as defined herein below, consistent with subsections (i) and (ii) above. Moreover, all system-generated alerts which the Corporation determined it would not file a SAR shall be included as part of the universe of transactions to be considered for review by the Consultant as part of the Look Back Review scope and methodology.



(B)     Kaufman-Rossin & Co. shall perform the Look Back Review, including the SAR Look-Back and the Correspondent Accounts Look-Back (the "<u>Consultant</u>") as previously submitted to, and approved by, the OCFI. The Consultant shall be available for periodic meetings with OCFI, if requested.

(C)     The purpose of the SAR Look-Back and the Correspondent Accounts Look-Back is to determine whether additional SARs should be filed by the Corporation's BSA Officer and informed to the Administrator for any previously unreported suspicious activity; to review the quality and accuracy of previous SAR filings to determine whether corrections or amendments are necessary to ensure that the suspicious activity identified was accurately reported in accordance with the BSA, particularly to determine whether (i) the SAR narrative clearly identifies the *who, what, where, when* and *why* the activity is considered suspicious; (ii) the method of operation (or how?) was included in the narrative; and (iii) that the narrative does not equate to a "defensive SAR" filing either to prevent criticism from regulators or as a response to an ongoing or completed examination; and to identify any accounts whose BSA/AML risk rating should be reevaluated including without limitation, any account owned by shareholders, officers, employees, directors of the Corporation or any of its affiliates.

11

(D)     The scope of the SAR Look-Back and the Correspondent Accounts Look-Back shall also include, in addition to the transactions identified in Paragraph (A) above, coverage of all of the Corporation's customer and account activity for the period covering October 1, 2016, through December 17, 2020, for accounts:

(i)      Owned by officers, employees, or directors of the Corporation or any of its affiliates (as the term "affiliate" is defined in 12 U.S.C. § 371c(b)(1)), or a family member of any such person;

(ii)     For which the Corporation received a law enforcement subpoena or a demand request.

(E)     By November 7, 2022, the Consultant shall provide the BSA Officer with a written report that contains a list of any SARs that should be filed or existing SARs that should be modified to meet the requirements of 31 C.F.R. § 1020.320, a list of accounts that represent excessive risk for BSA/AML compliance, and a conclusion about the effectiveness of the Corporation's suspicious activity monitoring. The SAR Look-Back report and the Correspondent Accounts Look-Back report should also, among other things, describe the methodologies and tools used in conducting the reviews, describe the process followed for investigating customers and customer activities, and provide a summary of the number and types of customers and accounts reviewed, number of customers and accounts requiring additional investigation, number of customers warranting SAR filings or modifications to existing SAR filings, and the number of customers where it was determined not to file SARs. The Administrator shall immediately provide a copy of the final written report of the findings and recommendations from the SAR Look-Back to the OCFI. The supporting materials and work papers associated with the SAR Look-Back and the Correspondent Accounts Look-Back shall be made available to the OCFI upon request subject to applicable privileges and confidentiality requirements protecting the information of the Corporation's customers in such materials.

(G)     Within thirty (30) days after completion of the Look Back Review, the BSA Officer shall prepare and file any additional SARs that are necessary based upon the review.

(H)     Based upon the results of the SAR Look-Back and the Correspondent Accounts Look-Back, the OCFI may require an expanded review of the Corporation's accounts and/or alerts.

12

# EXHIBIT 2

## SETTLEMENT AGREEMENT

This Settlement Agreement is made and entered into on the last day set forth on the signature page hereto by and between (a) the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF", by its Spanish acronym); (b) Bancrédito Holding Corporation ("BHC"); and (c) Bancrédito International Bank & Trust, Corporation ("BIBTC" and, together with OCIF and BHC, the "Parties", and individually the "Party").

## RECITALS:

WHEREAS, on January 11, 2023, OCIF filed a Complaint and Order Appointing a Receiver on a Provisional and Permanent Basis and Revocation of License against BIBTC (the "Receivership Order"), Case No. C-23-D-001 (the "Receivership Case") and scheduled an administrative hearing for January 20, 2023.

WHEREAS, on January 18, 2023, BIBTC filed its Answer to the Receivership Order and in relevant part, indicated that it had no objection to the receivership.



WHEREAS, on January 18, 2023, BHC filed (a) an Urgent Motion to Intervene; and (b) an Answer and/or Motion to Dismiss the Receivership Order, and on January 19, 2023, filed an Urgent Motion to Postpone the January 20, 2023 administrative hearing for a date later than Friday, January 27, 2023.

WHEREAS, on January 19, 2023, BHC's request for intervention was granted. The request for postponement of the hearing was also granted and the hearing was thus rescheduled for Saturday, January 28, 2023.

WHEREAS, on January 28, 2023, the Parties appeared at the hearing before the Administrative Examiner.

WHEREAS, after argument on all procedural matters but before the commencement of evidence presentation, the Parties engaged in negotiations to settle the Receivership Case, and other pending cases, and reached a settlement in principle, the terms and conditions of which were entered into the record of the proceedings with the consent of all the Parties, and are now set forth and agreed to below, for full resolution of all claims in the case, as well as other related cases as further described below.

WHEREAS, this settlement is being entered into for the purpose of avoiding the cost and uncertainty of litigation.

NOW THEREFORE, in consideration of the facts and promises contained herein, and for other good and valuable consideration, the receipt of which is acknowledged by each Party hereto, the Parties have reached the following:

## AGREEMENTS, RELEASES AND PROMISES

1. <u>Receivership and Revocation of License</u>. (a) Without admitting or denying the facts and the conclusions of law included by OCIF in the Receivership Order, BHC agrees to withdraw its objection to the Receivership Order and agrees to the appointment by OCIF of a receiver for BIBTC pursuant to the Receivership Order (the "Receivership"). Said receiver shall have the same authority, powers, duties, and responsibilities assigned to the receiver in the Receivership Order. For the avoidance of doubt that authority, powers, duties, and responsibilities are found in Sections VI and VII of the Receivership Order which hereby are incorporated by reference to this Settlement Agreement. BHC and BIBTC agrees to the appointment of Driven Administrative Services LLC ("Driven"), as the receiver (the "Receiver"). BHC and BIBTC fully and irrevocably waive their right to challenge the Receivership and/or the designation of Driven as the Receiver for BIBTC In accordance with such powers, the Receiver has the right to choose, maintain and/or engage the legal counsel that it deems appropriate to safeguard BIBTC's rights and interests, which right the Receiver shall exercise in its absolute discretion and without any interference from BHC or BIBTC,

(b)   BHC and BIBTC consent and agree to the revocation of BIBTC's license as an international banking entity issued pursuant to the IBE Act and waive any rights to a hearing under Article 8 of the IBE Act. For the avoidance of doubt, OCIF will continue to have jurisdiction over BIBTC and its affairs, until all matters contemplated in the Receivership Order, the Liquidation Plan and this Agreement have been fully satisfied (collectively, the "Receivership Documents").

(c)   For the avoidance of doubt, BHC does not accept or deny the facts in BIBTC's answer to the Receivership Order.

2. <u>Escrow.</u> The Parties agree that BIBTC needs to have access to all its funds to be able to complete BIBTC's liquidation pursuant to the Receivership Documents. In order to achieve this purpose, the Parties agree that the Receiver shall have absolute discretion to choose a financial institution or escrow agency (the "Escrow Agent") in which to open an escrow account (the "Escrow Account") that must comply with the following requirements, unless otherwise agreed to by the Parties in writing:

> a. is a reputable agency or financial institution or such as the Royal Bank of Canada or similar,
> b. located outside of the United States of America,
> c. cannot be a Related Person (as such term is defined in the Liquidation Plan),
> d. cannot be STIF Fund Services Ltd. ("STIF"), Berkeley Bank & Trust ("Berkeley"), nor any of the Britannia Group entities ("Britannia"), and
> e. the selection of the Escrow Agent must be subject to OCIF's prior supervisory determination of no-objection.

**FOR THE AVOIDANCE OF DOUBT, THE PARTIES AGREE THAT THE RECEIVER SHALL HAVE FULL AUTHORITY TO DETERMINE WHERE TO OPEN THE**

ESCROW ACCOUNT AND SHALL BE FREE FROM ANY EFFORTS BY THE PARTIES TO OBSTRUCT OR INFLUENCE THE SELECTION PROCESS AND THE OPENING OF THE ESCROW ACCOUNT, SUBJECT TO: (I) OCIF'S NO-OBJECTION RIGHT TO THE SELECTION OF THE ESCROW AGENT, (II) THE REQUIREMENTS LISTED IN SUBSECTION a. THROUGH e. OF SECTION 2.

BHC and BIBTC have each had the opportunity to review the Escrow instructions provided by the Receiver, that are acceptable and/or required by the Escrow Agent chosen by the Receiver for the Escrow. BHC and BIBTC agree to and accept the Escrow instructions, which are attached hereto as Addendum A.

3.  <u>Britannia and STIF Funds</u>. The Parties acknowledge that BIBTC has funds held in accounts at Britannia (the "Britannia Funds") in the United Kingdom and the Bahamas, and STIF (the "STIF Funds") in Cyprus (collectively the "Britannia and STIF Funds"), which are indispensable for BIBTC to complete the process of liquidation. BHC agrees to cause the transfer of any and all of BIBTC's account balances at Britannia and STIF, which at present amount to approximately $26,800,000, to the Escrow Account (the "Transfers"). BHC represents that the Britannia Group of entities, who share common ownership with BHC, are aware of this Agreement and will honor its terms including the transfer of the STIF Funds. Once the Escrow Account is funded with at least all of the Britannia Funds, approximately $17,400,000, the Receiver can commence to execute the steps referenced in paragraphs 4 and 5 below (and as more amply described in the Flow of Funds, dated March 2, 2023, attached and incorporated hereto as Addendum B). Notwithstanding the foregoing, BHC will take all necessary actions to cause the STIF Funds to be transferred to BIBTC. The Transfers are a *sine qua non* condition for BHC to be considered in compliance with this Settlement Agreement, and any failure to deliver the full amount of the BIBTC funds to the Escrow Account within five (5) days of the Receiver's notification that the Escrow Account has been opened (the "Notice") in accordance to the terms of this Agreement, including any funds held at the Britannia Group of entities, shall be considered a material breach by BHC of the same. This will subject BHC to liquidated damages in an amount to be calculated based on overnight deposits on applicable United States Treasury Notes rates plus 5% for the amounts that have not been received in the Escrow Account, in addition to any losses, damages, liabilities, deficiencies, claims, actions, penalties, fines, costs or expenses of whatever kind (including attorneys' fees) incurred or suffered by BIBTC for BHC's breach of this Agreement, including, without limitation, consequential, indirect, incidental, special, exemplary, punitive or enhanced damages. For the avoidance of doubt, failure to deliver the full amount of the BIBTC funds at STIF shall not trigger the liquidated damages provision detailed herein, provided, however, that BHC fully cooperates with the Receiver to cause any BHC affiliates or entities under common ownership to present clear and specific instructions or clarifications to STIF to effectuate the withdrawal or transfer of any BIBTC funds at STIF.





4.  <u>Receivership Operational Budget</u>. The Parties agree and acknowledge that the Receiver needs funds for the operational expenses of BIBTC in receivership and shall be able to withdraw moneys from the Escrow Account, from time to time, in order to complete the implementation of BIBTC's liquidation (the "Liquidation Budget"). In this regard, the Receiver has determined that, after

Case 5:23-cv-00575-M-BM   Document 10-1   Filed 11/06/23   Page 45 of 58

discharging all of its obligations, including the payout of any pending non-related depositors, BIBTC needs approximately $11,500,000 as Liquidation Budget, of which approximately $8,250,000 to $9,250,000 is needed to fund the Receivership operational budget. BIBTC currently has approximately $5,270,000 on account at Facebank International Corporation ("FaceBank"). BHC and BIBTC agree that the deficiency necessary to cover the Liquidation Budget, which deficiency is currently estimated at $8,250,000 to $9,250,000 (the "Estimated Deficiency"), will be funded by transferring from funds in the Escrow Account to BIBTC's account at FaceBank after the Transfer mentioned in Paragraph 3 above.

5. <u>Berkeley</u>. Once the Britannia Funds are transferred to the Escrow Account, the Estimated Deficiency has been transferred to BIBTC's account at FaceBank to cover deficiencies in the Liquidation Budget per Paragraph 4 above, and BIBTC has entered into a settlement agreement with Berkeley, BIBTC will make an internal transfer of $26,000,000 from its deposit account at Berkeley to the Berkeley designated custodial account. BIBTC will disburse $779,000 from the Escrow Account to Berkeley to cover client deposits that are pending to be transferred to Berkeley. BIBTC will then reconcile and offset the deposit and custodial account transfer fees owed by Berkeley to BIBTC under that certain Purchase and Assumption Agreement dated July 29, 2022, from the remaining amount of approximately $1,400,000 owed to Berkeley by BIBTC from the Escrow Account.

6. **The Art Sales Agreement.** The Parties acknowledge and agree that the Art Sales Agreement between BIBTC and International Art Group Limited (INTERART) Fund (represented by Britannia Wealth Management SA as INTERART's Investment Manager), dated June 24, 2022, as amended and incorporated herein by reference (the "Art Sales Agreement"), is terminated upon the execution of this Agreement. The Parties further acknowledge that the remaining works of art that belong to BIBTC which were the object of the Art Sales Agreement belong to the Bank and will be subject to the Liquidation Plan, for which the Receiver shall be free to dispose of the same pursuant to the Liquidation Plan and the Receivership Order.

7. <u>FinCEN and USDOJ</u>. The Receiver engaged on January 29th, 2023, the law firm of McDermott Will & Emery ("MWE") to serve as main counsel for the Bank in the negotiations with the Financial Crimes Enforcement Network ("FinCEN") and the U.S. Department of Justice ("DOJ") regarding proceedings initiated by those agencies in connection with BIBTC. BHC and BIBTC agree to cooperate with the Receiver in those negotiations as deemed appropriate and necessary by the Receiver. Fines imposed by FinCEN or the USDOJ, if applicable, will be payable from the Escrow Account.

Notwithstanding the foregoing the Receiver reserves the right to choose, maintain, engage or disengage such counsel that it deems appropriate from time to time to safeguard BIBTC's rights and interests (including, but not limited to proceedings, claims, matters or investigations, (whether pending or threatened) by FinCEN or the USDOJ), which right the Receiver shall exercise in its absolute discretion and without any interference from BHC or BIBTC.

Further, the Receiver agrees to certify to BHC, in writing, that it does not object to the participation of BHC's counsel in the negotiations with FinCEN and USDOJ on behalf and in representation of BHC; provided, however, that the Parties recognize and acknowledge that the decision to allow BHC's participation in said negotiations lies exclusively with FinCEN and USDOJ, and provided further that the Receiver shall retain exclusive authority to negotiate, settle or reach any resolution on behalf of BIBTC with FinCEN or the USDOJ.

8.  Reporting by Receiver. The Receiver will issue a weekly flow of funds report (see Addendum B) to OCIF and BHC, in the same format used in its prior appointment as Administrator under the Plan and shared with BHC's counsel and OCIF during the meetings of the Bank's *Comité de Finiquito*, which report will be made available to BHC's counsel when the same is finalized, on a weekly basis.

9.  Proposals by BHC. BHC as the ultimate beneficiary of the property and other rights in BIBTC shall have the right to make proposals and suggestions to Driven as Receiver of BIBTC and Driven as Receiver of BIBTC shall have the ultimate discretion to act or not on such proposals and suggestions, pursuant to the terms of the Receivership Order. Any proposal or suggestion made by BHC shall be made in writing with a copy to OCIF.

10. Bond. The Receiver will provide a fidelity bond in the minimum amount of $2,000,000.

11. Dismissal of Related Cases. On the same date that the instant Settlement Agreement is executed:



   a.  BHC will file a Motion to Dismiss with Prejudice Case No. 22-cv-01644-PAD-BJM pending before the United States District Court for the District of Puerto Rico that was filed by BHC against OCIF on December 28, 2022 (the "Federal Case");
   b.  OCIF will request that Case No. CC22-D-010 before OCIF related to the Complaint and Cease and Desist Order of December 21, 2022 against BIBTC and BHC (the "Cease and Desist Case") be dismissed with prejudice and closed; and
   c.  OCIF will request the Receivership Case be dismissed and closed. The Parties understand and agree that the Receivership Order as modified by this Settlement Agreement will be in full force and effect and that OCIF will retain exclusive jurisdiction as allowed by law to address any future controversies arising from or in connection with the Receivership Documents.

12. Termination of Plan of Liquidation. The liquidation of BIBTC will be deemed completed upon the issuance by the Receiver of its Final Report pursuant to the Receivership Documents, a written certification from counsel for the Receiver that it would be reasonable to conclude that there are no known outstanding proceedings, claims, matters or investigations (whether pending or threatened) against BIBTC (including those with FinCEN and the USDOJ) that could result in fines, and OCIF's final approval.

13. Termination of Cases. This Agreement terminates the Receivership Case, the Cease and Desist Case and the Federal Case, and all claims, disputes, causes of action, controversies and/or

Case 5:23-cv-00575-M-BM    Document 10-1    Filed 11/06/23    Page 47 of 58

disagreements between the Parties related thereto; provided however that the Receivership Order as modified by this Settlement Agreement will continue in full force and effect until it is terminated pursuant to its terms.

14.　Indemnification. BIBTC and BHC, joint and severally, shall continue to indemnify BIBTC's officers, directors, employees, agents and the Receiver in accordance with its certificate of incorporation, bylaws, and contractual arrangements as therein or elsewhere as it was provided in the Liquidation Plan, BIBTC's existing directors' and officers' liability insurance policy and applicable law, and such indemnification shall apply to acts or omissions of such persons in connection with their responsibilities as officers and directors of BIBTC, the implementation of the Receivership Documents and the winding down of the affairs of BIBTC. The Receiver is expressly authorized to obtain and maintain insurance as may be necessary and reasonable to cover BIBTC's indemnification obligations.

15.　Final Agreement. This Settlement Agreement may not be supplemented, changed, waived, discharged, eliminated, modified or omitted except by written document executed by all the Parties. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all previous negotiations and discussions between the Parties, and their predecessors or successors in interest, and neither parole evidence nor any prior or other agreement shall be permitted to contradict or vary the terms and conditions listed herein. There are no promises, terms, conditions, or obligations between the Parties other than those contained in this Agreement. Notwithstanding the aforementioned, all provisions of the Liquidation Plan that are not in conflict with this Agreement will continue in full force and effect.



16.　Successors. This Settlement Agreement shall bind the Parties' respective successors, assigns, heirs and personal representatives.

17.　References. All references to the singular shall include the plural and all references to one gender herein shall include both genders.

18.　Governing Law. This Settlement Agreement is entered into in Puerto Rico, and any rights, remedies, or obligations provided for herein shall be construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico.

19.　Construction and Interpretation. This Settlement Agreement shall be construed as if all Parties jointly prepared it, and any uncertainty or ambiguity in this Settlement Agreement shall not be interpreted against any one Party. The Parties acknowledge that this Settlement Agreement is executed voluntarily by each of them without any duress or undue influence on the part of, or on behalf of, any of them. The Parties further acknowledge that they have or had the opportunity for representation in the negotiations for, and in the performance of, this Settlement Agreement by counsel of their choice and that they have read this Settlement Agreement and have had it fully explained to them by their counsel, and that they are fully aware of, and agree to, the contents of this Settlement Agreement and its legal effects.

Page 6 of 9

20. <u>Severability</u>. The provisions of this Settlement Agreement are severable such that, if any portion, provision, or part of this Settlement Agreement is held, determined, or adjudicated to be invalid, unenforceable, or void for any reason whatsoever, each such portion, provision or part shall be severed from the remaining portions, provisions, or parts of this Settlement Agreement and shall not affect the validity or enforceability of any remaining portions, provisions or parts of the Settlement Agreement.

21. <u>Proper Parties</u>. The Parties represent and warrant to each other that each is the sole and lawful owner of all right, title, and interest in and to every claim and other matter which each releases in this Settlement Agreement and that they have not previously assigned or transferred, or purported to do so, to any person or other entity any right, title, or interest in any such claim or other matter. In the event that such representation is false, and any such claim or matter is asserted against either Party by anyone who is the assignee or transferee of such a claim or matter, then the Party who assigned or transferred such claim or matter shall fully indemnify, defend, and hold harmless the Party against whom such claim or matter is asserted and its successors from and against such claim or matter. The individuals whose signatures are affixed to this Settlement Agreement in a representative capacity represent and warrant that they are authorized to execute this Settlement Agreement on behalf of and to bind the entity on whose behalf the signature is affixed.



22. <u>Facsimiles and Counterparts</u>. This Settlement Agreement may be executed in counterpart facsimile signatures and all such counterparts shall constitute a single form of this Settlement Agreement. A copy of this Settlement Agreement shall be valid and binding as if it were an original ink signature.

INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the last day set forth below.

**OCIF:**

By: _____

Name: Natalia Zequeira

Title: Commissioner

Date: March 13, 2023.

**Counsel for OCIF:**

H. LÓPEZ LAW, LLC
Metro Office Park
Building 11, Suite 105-A
Guaynabo, PR 00968
Tel. 7870422-0243

_____
Heriberto López-Guzmán
RUA _____
hlopez@hlopezlaw.com

**BHC:**
By: _____

Name: Luis A. Zapata

Title: CEO & President

Date: March, 10th, 2023.

**Acknowledged and accepted by Driven Administrative Services LLC as Receiver for BIBTC:**

By: _____

Name: Ryan Marin

Title: Receiver and Managing Member

Date: March 10th, 2023.

**Counsel for BIBTC and Receiver:**

MCCONNELL VALDÉS LLC
270 Avenida Muñoz Rivera
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, Puerto Rico 00936-4225
Tel. 787-250-4632

_____
Arturo J. García Solá
RUA 8031
ajg@mcvpr.com

Page 8 of 9

Counsel for BHC:

ESTRELLA LAW, LLC
PO Box 9023596
San Juan, Puerto Rico 00909-3596
Tel. 787-977-5050

Alberto G. Estrella
RUA 11350
agestrella @ estrellalle.com

THE LS LAW FIRM
One Biscayne Tower, Suite 2530
2 South Biscayne, Florida 33131
Tel. 305-503-5503

Lilly Ann Sanchez

**ADDENDUM A**

**ESCROW ACCOUNT INSTRUCTIONS**

## I.  General Funding Instructions:

Within 48 hours of the Escrow Account opening, the Receiver will notify OCFI and BHC of such Escrow Account opening, and will provide the following instructions to the parties involved:

### A.  Britannia:

1. The Receiver will instruct **Britannia Global Markets** via email to transfer, within five (5) days of the receipt of the instruction, all of BIBTC's available cash funds to the Escrow Account to be established by the chosen Escrow Agent at the Escrow Bank.

2. The Receiver will instruct **Britannia Bank & Trust** via email to transfer, within five (5) days of the receipt of the instruction, all of BIBTC's available cash funds to the Escrow Account to be established by the chosen Escrow Agent at the Escrow Bank.

3. The Receiver will instruct **Britannia Global Investments** via email to transfer, within five (5) days of the receipt of the instruction, all of BIBTC's available cash funds to the Escrow Account to be established by the chosen Escrow Agent at the Escrow Bank.

4. The Receiver will instruct **Britannia Securities** via email to transfer, within five (5) days of the receipt of the instruction, all of BIBTC's available cash funds to the Escrow Account to be established by the chosen Escrow Agent at the Escrow Bank.

### B.  STIF:

1. The Receiver will instruct **STIF** via email to transfer, within five (5) days of the receipt of the instruction, all of BIBTC's available cash funds to the Escrow Account to be established by the chosen Escrow Agent at the Escrow Bank.

## II.  General Withdrawal Instructions:

Once the Britannia Funds are transferred to the Escrow Account, the Receiver will provide the following instructions to the Escrow Agent:

### A.  Operational Budget:

1. The Receiver will instruct the Escrow Agent to transfer from BIBTC's Escrow Account to BIBTC's account at Facebank as the initial funding of the Receivership budget estimated at approximately $11.5 million.

**B. Berkeley Bank & Trust:**

1. The Receiver will instruct the Escrow Agent to transfer from BIBTC's Escrow Account to Berkeley the amount necessary to cover client deposits that are pending to be transferred to Berkeley.

2. The Receiver will instruct the Escrow Agent to transfer from BIBTC's Escrow Account to Berkeley the net amount resulting from the reconciliation and offset of the Berkely deposit balances pending and the custodial and deposit accounts transfer fees owed by Berkeley to BIBTC under the existing Purchase and Assumption Agreement dated July 29, 2022.

**C. USDOJ**



1. The Receiver will instruct the Escrow Agent to transfer from BIBTC's Escrow Account to the United States Treasury Department the amount settled on the Plea Agreement between BIBTC and USDOJ, as applicable.

**D. FinCEN**

1. The Receiver will instruct the Escrow Agent to transfer from BIBTC's Escrow Account to the United States Treasury Department the amount settled on the Consent Order between BIBTC and FinCEN, as applicable.

**E. Client Deposits and Other Third Parties**

1. The Receiver may instruct the Escrow Agent to withdraw money from BIBTC's Escrow Account from time to time, in connection with the completion of BIBTC's liquidation, including payments to clients, providers, or third parties.

Addendum B

Prepared by Britannia (March 3, 2023)

| | Flowback | Escrow Account | Berkeley | STIF | Britannia | Others |
|---|---|---|---|---|---|---|
| Account balances as of 2/24/2023 | 5,117,000 | 18,075,000 | 25,000,000 | 9,397,000 | 19,075,000 | 478,000 |
| Funding of Escrow account from Britannia | | 9,397,000 | | | (19,075,000) | |
| Funding of Escrow account from STIF | | (9,400,000) | | (9,397,000) | | |
| Funding of Syndication budget | 8,400,000 | | | | | |
| Payment of Berkeley deposits | | | (25,000,000) | | | |
| Noostrup deposit payment | (1,228,000) | | | | | |
| Waterridge deposit payment | (216,000) | | | | | |
| Payment of monetized client deposits pending | (366,000) | | | | | |
| Payment of client deposits that didn't sign the release and waiver | | (775,000) | | | | |
| Final payment of Berkeley's deposit balance | | (3,375,000) | | | | |
| Collection of Berkeley's deposit and custodial accounts transfer fees | | 690,000 | | | | |
| Payment of baseline amounts to OCF | (251,000) | | | | | |
| Payment for Works of Art | - | 19,513,000 | | | | |
| Payment for Works of Art shipping costs | | 488,000 | | | | |
| **Total** | **11,514,000** | **37,613,000** | **-** | **-** | **-** | **478,000** |

**Steps pending to finalize payment of client deposits**

BRTC will open an Escrow Account in a reputable global financial institution (BBC or Similar) that resides outside the US Territory so that all account balances remaining at Britannia and STIF are transferred to the Escrow Account.

1) BRTC to transfer all account balances remaining at Britannia of $19.1MM to the Escrow Account.
2) BRTC will transfer that all account balances remaining at STIF of $9.4MM are transferred to the Escrow Account.
3) From the Escrow Account, BRTC will transfer that the necessary remaining funds (Estimated between $4.25MM to $5.25MM) to fully fund the Syndication operational budget of $11.9MM.
4) BRTC will prepare an interim transfer to Berkeley of its $26MM deposit balance.
5) BRTC to disburse all non-vested client deposit pending from its Flowback account.
6) BRTC to disburse $77M from the Escrow account to Berkeley for client deposits that are pending moving over to Berkeley.
7) BRTC and Berkeley will reconcile and agree to the deposit and custodial accounts transfer fees owed by Berkeley to BRTC under the existing agreement as part of the final settlement and payment of Berkeley's deposit balance.
8) BRTC to disburse the remaining account balances of $0.69M to OCF once instructions are received.
9) The Interest Fund will deposit in the Escrow Account the remaining $19.5MM payment of the Works of Art pending to be delivered.
10) BRTC will invoice Interest Fund the corresponding 50% allocation of the Works of Art shipping costs.

# **EXHIBIT 3**

**APPLICATION FOR CERTIFICATE OF AUTHORITY FOR A LIMITED LIABILITY COMPANY**
*(Form L-09)*

| | |
|---|---|
| **Item 1** | Enter the complete name of the limited liability company (LLC) exactly as it appears in the records of the appropriate official in the state or country of formation. If the name cannot be used in North Carolina, enter the name (including an applicable limited liability company ending) that it wishes to use in North Carolina. |
| **Item 2** | Enter the state or country of formation. |
| **Item 3** | Select item "a" if the LLC has a principal office. Enter the complete street address of the principal office and the county in which it is located. If mail is not delivered to the street address of the principal office or if you prefer to receive mail at a P.O. Box or Drawer, enter the complete mailing address of the principal office. |
| | Select item "b" if the LLC does not have a principal office. |
| **Item 4** | Enter the name of the registered agent. The registered agent must be a North Carolina resident, an existing domestic business corporation, nonprofit corporation or limited liability company, or a foreign business corporation, nonprofit corporation or limited liability company authorized to transact business or conduct affairs in North Carolina. |
| **Item 5** | Enter the complete street address of the LLC's registered office and the county in which it is located. The registered office address must be located in North Carolina. |
| **Item 6** | Enter the complete mailing address, in North Carolina, of the LLC's registered agent, only if mail is not delivered to the street address above or if you prefer to receive mail at a P.O. Box or Drawer. |
| **Item 7** | Enter the names, titles, and usual business address of the current principal company officials of the LLC. |
| **Item 8** | Attach a current Certificate of Existence or document of similar import with filing. |
| **Item 9** | If needed, a statement indicating a copy of the resolution of its managers adopting a fictitious name is attached. |
| **Item 10** | The Department offers a free voluntary notification system for which you may choose to participate. If you would like to receive this free service, please provide a business e-mail address in the space provided. Your participation will not result in your e-mail address being viewable on our website. Participation will help us to prevent identity theft in the event an unauthorized person submits a fraudulent document for filing in the name of the business entity. |
| **Item 11** | The document will be effective on the date and at the time of filing, unless a delayed date or an effective time (on the date of filing) is specified. If a delayed effective date is specified without a time, it will be effective at 11:59:59 p.m. A delayed effective date may be specified up to and including the 90th day after the day of filing. |

**Date and Execution**

Enter the date the document was executed.
In the blanks provided enter:

- The name of the limited liability company as it appears in Item 1.
- The signature of the principal company official of the LLC executing the document.
- The name and title of the above-signed principal company official.

**Attention**: Foreign Limited Liability Companies wishing to render a professional service as defined in N.C.G.S. §55B-2(6) shall contact the appropriate North Carolina licensing board to determine whether compliance with additional licensing requirements may be mandated by law. Such limited liability companies should consult N.C.G.S. §57D-2-02 for further details.

NC057 - 11/9/2017 Wolters Kluwer Online

*State of North Carolina*
*Department of the Secretary of State*

## APPLICATION FOR CERTIFICATE OF AUTHORITY
## FOR LIMITED LIABILITY COMPANY

Pursuant to §57D-7-03 of the General Statutes of North Carolina, the undersigned limited liability company hereby applies for a Certificate of Authority to transact business in the State of North Carolina, and for that purpose submits the following:

1. The name of the limited liability company is ___DRIVEN ADMINISTRATIVE SERVICES LLC___;

   and if the limited liability company name is unavailable for use in the State of North Carolina, the name the limited

   liability company wishes to use is _____.

2. The state or country under whose laws the limited liability company was formed is ___11/11/2021___.

3. Principal office information: *(Select either a or b.)*

   a. ☒ The limited liability company has a principal office.

   The principal office telephone number: ___787-725-1500___.

   The street address and county of the principal office of the limited liability company is:

   Number and Street: ___B-7 TABONUCO STREET SUITE 302___

   City: ___GUAYNABO___ State: ___PR___ Zip Code: ___00968___ County: ___GUAYNABO___

   The mailing address, *if different from the street address*, of the principal office of the corporation is:

   Number and Street: ___PO BOX 363343___

   City: ___SAN JUAN___ State: ___PR___ Zip Code: ___00936-3343___ County: ___SAN JUAN___

   b. ☐ The limited liability company does not have a principal office.

4. The name of the registered agent in the State of North Carolina is: ___C T Corporation System___.

5. The street address and county of the registered agent's office in the State of North Carolina is:

   Number and Street: ___160 Mine Lake Ct., Ste. 200___

   City: ___Raleigh,___ State: NC  Zip Code: ___27615-6417___ County: ___Wake___

6. The North Carolina mailing address, *if different from the street address,* of the registered agent's office in the State of North Carolina is:

   Number and Street: _____

   City: _____ State: NC  Zip Code: _____ County: _____

APPLICATION FOR CERTIFICATE OF AUTHORITY
Page 2

7. The names, titles, and usual business addresses of the current company officials of the limited liability company are:
   *(use attachment if necessary) (This document must be signed by a person listed in item 7.)*

| Name and Title | Business Address |
|---|---|
| RYAN MARIN, PRESIDENT | B-7 TABONUCO STREET SUITE 302 GUAYNABO PR 00968 |
| WALLACE RODRIGUEZ, VICE PRESIDENT | B-7 TABONUCO STREET SUITE 302 GUAYNABO PR 00968 |
| SIGFREDO VELEZ, SECRETARY | B-7 TABONUCO STREET SUITE 302 GUAYNABO PR 00968 |
| WIGBERTO MARCANO, TREASURER | B-7 TABONUCO STREET SUITE 302 GUAYNABO PR 00968 |

8. Attached is a certificate of existence (or document of similar import), duly authenticated by the secretary of state or other official having custody of limited liability company records in the state or country of formation. **The Certificate of Existence must be less than six months old. A photocopy of the certification cannot be accepted.**

9. If the limited liability company is required to use a fictitious name in order to transact business in this State, a copy of the resolution of its managers adopting the fictitious name is attached.

10. (Optional): Please provide a business e-mail address: CYORTIZ@DRIVENADVISORS.COM
    The Secretary of State's Office will e-mail the business automatically at the address provided above at no cost when a document is filed. The e-mail provided **will not** be viewable on the website. For more information on why this service is offered, please see the instructions for this document.

11. This application will be effective upon filing, unless a delayed date and/or time is specified: _____.

This the 27 day of JUNE, 20 22

DRIVEN ADMINISTRATIVE SERVICES LLC
*Name of Limited Liability Company*

*Signature of Company Official*

RYAN MARIN, Company official of the LLC
*Type or Print Name and Title*

Notes:
1. **Filing fee is $250**. This document must be filed with the Secretary of State.